LAC D'AMIANTE DU QUEBEC, LTEE., a corporation of the State of Delaware, Plaintiff,

v.

AMERICAN HOME ASSURANCE CO., a corporation of the State of New York, and Highlands Insurance Company, a corporation of the State of Texas, and Midland Insurance Company, a corporation of the State of New York, Defendants.

Civ. A. No. 83–2108.

United States District Court, D. New Jersey.

July 31, 1985.

Porzio, Bromberg & Newman, P.C. by Myron J. Bromberg, Morristown, N.J., Covington & Burling by Robert N. Sayler, John G. Buchanan III, Washington, D.C., for plaintiff.

De Gonge, Garrity & Fitzpatrick, P.C. by Francis X. Garrity, Bloomfield, N.J., for defendant American Home Assur. Co.

Durand, Gorman, Heher, Imbriaco & Lynes by Jerome M. Lynes, Newark, N.J., for Highlands Ins. Co.

Suarez & Suarez by Michael Suarez, Jersey City, N.J., for defendant Midland Ins. Co.

## OPINION

BARRY, District Judge.

Thousands upon thousands of claims arising out of asbestos related diseases which have become manifest are currently pending in federal and state courts with new filings increasing dramatically. Total liability projections between the years 1980 and 2015 range from $7.6 billion to $87.1 billion [1] with aggregate judgments and set-

---

1. Note, "Adjudicating Asbestos Insurance Liability: Alternatives to Contract Analysis", 97 Harv. L.Rev. 739, n. 2 citing P. MacAvoy, J. Karr & P. Wilson, "The Economic Consequences of Asbes- tos Related Disease 4–12 (July 1983) (unpublished working draft on file in Harvard Law School Library).

tlements over the next thirty years expected to reach $38 billion and the costs of defending such suits over the same time period estimated conservatively at $25 to $30 billion.[2] Indeed, the claims currently pending represent only a small percentage of the total number of potential claimants.

The vast number of cases, and the concomitant potential for tort liability of staggering proportions, has spawned yet additional litigation seeking to determine whether and when asbestos manufacturers or sellers or their insurers must ultimately bear the costs of defending these suits and compensating asbestos victims. At least five United States Courts of Appeals and numerous district courts have considered the issue of asbestos insurer liability. While all have held for the insureds, most commonly in declaratory judgment actions seeking to clarify the parties' rights and obligations under Comprehensive General Liability (CGL) policies, the courts have offered conflicting interpretations of the manner in which virtually identical policies allocate liability between successive insurers and between insurers and insureds.

In part, these differing interpretations are a result of the insidious progression of asbestos related diseases over many years which renders the concept of "injury" so difficult to define. Clearly, "injury" might refer to the tissue damage which is the immediate result of the initial exposure to or inhalation of asbestos fibers. It might as well describe the continuing presence of these fibers in the body even though exposure and inhalation may have ceased and even though disease cannot yet be detected. Or perhaps "injury" is simply the outward manifestation of an asbestos related disease. Difficulty in determining which occurrence or set of occurrences during the lengthy developmental process constitutes the injury leads to different conclusions as to the specific coverage period (or period in which the asbestos producer is uninsured)

to which that injury or disease should be assigned.

The differing interpretations are also due, in part, to the desire of some courts to maximize coverage even when to do so requires judicial sleight of hand. One should not dwell too long, however, on the apparent inequity inherent in this result-oriented approach. Given the considerable potential liability for asbestos claims and the insurance industry's refusal either to afford coverage altogether or to make such coverage affordable, such an approach is at least understandable.

The issues before those courts and now before this court have been described as "difficult" by one, "impossible" by another, and, in Judge Troutman's words, issues which "will perplex both district and circuit courts until they are resolved by the ultimate appellate authority." *ACandS, Inc. v. Aetna Casualty and Surety Co.,* 576 F.Supp. 936, 943 (E.D.Pa.1983).[3] Meanwhile, we press on, here prodded by a plaintiff against whom over 4500 claims alleging injury due to direct exposure to asbestos had been filed by the end of 1983, at which time its liability for personal injury settlements totalled nearly $4,500,000 and the costs of defending such claims exceeded $11,000,000. Six claims for property damage, a new area of asbestos litigation, had also been filed by that point, with more than $163,000 in costs of defense attributable to those claims.

## I

Plaintiff Lac d'Amiante du Quebec, Ltee. ("LAQ"), a Delaware corporation with its principal place of business in Quebec, Canada, and a wholly owned subsidiary of the American Smelting and Refining Co. (ASARCO), has been engaged since 1958 in the business of mining and selling asbestos which is thereafter used by other companies as a component or constituent of vari-

---

2. Note, "Insurance Coverage of Asbestos Claims—Running for Cover or Coverage", 32 Emory L.J. 901, n. 1, citing Hamilton, Rabinovitz & Stanton, Inc., "Cutting the Overhead Costs of Resolving Asbestos Claims: A Time For Action" 3 (Nov. 1982).

3. Query whether review by the Supreme Court of the United States is likely given that Court's policy against reviewing rulings of Courts of Appeals that purport to be based on state law?

ous products manufactured for their use or for sale to third parties. Until February 1, 1962, LAQ was insured by the Employers Liability Insurance Corporation of Canada for an annual aggregate of $50,000. From February 1, 1962 until November 21, 1972, LAQ's coverage, in the same amount, was continued by Canadian General Insurance Company. From November 21, 1972 until February 1, 1974, LAQ increased its coverage with Canadian General to $100,000 annually and, from February 1, 1974 to February 15, 1976, increased this coverage to $300,000.[4] Neither the Employers Liability Insurance Corporation of Canada nor the Canadian General Insurance Company are named as defendants in this action, and LAQ seeks protection only under its liability insurance coverage extending from 1975 to 1984.

At issue here are ten policies underwritten by defendant American Home Assurance Co., four policies issued by defendant Midland Insurance Co., and one policy issued by defendant Highland Insurance Co.[5] On March 15, 1975 and continuing until March 15, 1984, LAQ was covered by an excess indemnity or "umbrella" liability policy issued by defendant American Home Assurance Co. in an annual aggregate amount of $3,000,000 with the sole exception being the policy period of 1976–77, when LAQ's umbrella coverage from American Home was $4,000,000, coverage excess to a $1,000,000 self-insured retention. From March 15, 1977 to March 15, 1982, the American Home policies were written in excess of a $2,500,000 self-insured retention and from March 15, 1982 through March 15, 1984, the American Home policies were issued in excess of a $3,000,000 self-insured retention.

On March 15, 1975, LAQ obtained coverage in the amount of $20,000,000 in excess of American Home's umbrella coverage from defendant Highlands Insurance Co. When Highlands left the risk a month and a half later on April 29, 1975, LAQ obtained virtually the same coverage supplied by Highlands from defendant Midland Insurance Co. from April 1975 until March 15, 1976 and then until March 15, 1977. During the policy term 1976–1977, LAQ obtained an additional $10,000,000 excess coverage from Midland. From March 15, 1977 to March 15, 1978, Midland's coverage was $5,000,000 over the primary umbrella policy issued by American Home and a $2,500,000 self-insured retention.

Thus, from 1958 to 1972, LAQ maintained an aggregate of $50,000 in products liability insurance annually, increasing to $100,000 in 1972, to $300,000 in 1974, to $23,000,000 in 1975,[6] and to $34,000,000 in 1976. Nine of the American Home policies are umbrella policies, and the Highlands policy, the Midland policies, and the remaining American Home policy are form following excess policies, with coverage above that of the American Home umbrella policies for the period March 15, 1975 through March 15, 1978.

The policies that defendants issued to plaintiff are identical in all relevant respects, and the parties have stipulated that the operative provisions are the same. It also has been stipulated that each form following policy incorporates and follows the operative terms and conditions of the umbrella policy that underlies it, that each excess policy is wholly governed by the underlying umbrella policy, and that the operative coverage provisions in the American Home umbrella policies do not differ in any significant respect from those in the standard Comprehensive General Liability policies widely used in the insurance industry.

---

**4.** Subsequently, Canadian General paid LAQ approximately $1.7 million in full and final payment of all of Canadian General's past and future obligations to LAQ.

**5.** The parties have stipulated to the identity, authenticity and validity of each policy, and to the fact that plaintiff is an insured covered under that policy. Similarly, it has been stipulated that the insurers drafted the policies; that

the policies all contained standard form provisions; and that any variations in wording in the various policies over the years have no substantive significance for purposes of this motion.

**6.** Defendant Midland Insurance Co. points to this "dramatic quantum leap" as being roughly coincident with LAQ's receipt of the first products liability claim against it. LAQ offers other explanations.

Thus, under the "Coverage" provision of a representative umbrella policy, the insurer undertakes:

[t]o pay on behalf of the Insured that portion of the ultimate net loss in excess of the retained limit as hereinafter defined, which the Insured shall become legally obligated to pay as damages for liability imposed upon the Insured by law, or liability assumed by the Insured under contract because of (i) personal injury, [or] (ii) property damage, ... as defined herein caused by an occurrence.

The term "occurrence" is defined as:

an event, including continuous or repeated exposure to conditions, which result in Personal Injury or Property Damage during the policy period....

"Personal injury" is defined as:

bodily injury, sickness, disease, including death anytime resulting therefrom ... which occurs during the policy period.

"Property damage" includes:

physical injury to or destruction of tangible property, which occurs during the policy period, including loss of use thereof at any time resulting therefrom....

"Ultimate net loss" is defined as:

the total sum which the Insured ... become[s] obligated to pay by reason of personal injury [or] property damage ... claims, either through adjudication or compromise, and shall also include ... all sums paid or payable ... for ... defense of claims....

Under the "Defense, Settlement, Supplementary Payments" provision the insurer undertakes to:

defend any suit against the Insured alleging liability insured under the provisions of this policy and seeking recovery for damages on account thereof even if such suit is groundless, false or fraudulent....

## II

In cross-motions for summary judgment based on the policy language and their respective theories of coverage, the parties seek resolution by the court of various issues regarding the application of the insurance policies issued by the defendants to asbestos related personal injury claims and asbestos related property damage claims. Stated broadly, the question for resolution is who bears the risk and how far does that risk extend? More specifically, the following issues are posed:

1. *The trigger of indemnity coverage:* Under a liability insurance policy, is coverage for an asbestos-related settlement or judgment triggered only if exposure to or installation of asbestos occurred during the policy period, or is such coverage triggered if any part of the continuing personal injury or property damage occurred during the policy period?

2. *The extent ·of indemnity coverage:* Once the coverage of a policy for an asbestos-related settlement or judgment is triggered pursuant to paragraph 1, is the insurer liable for only a prorated portion of the amount of the settlement or judgment, or is it jointly and severally liable for the total amount of the settlement or judgment without proration to the insured (subject to contribution by other insurers)?

3. *The trigger of defense coverage:* Under a liability insurance policy, is coverage for the costs of defending an asbestos-related claim triggered only if the alleged exposure to or installation of asbestos potentially falls within the policy period, or is such coverage triggered if any part of the alleged continuing personal injury or property damage potentially falls within the policy period?

4. *The extent of defense coverage:* Once the coverage of a policy for the costs of defending an asbestos-related claim is triggered pursuant to paragraph 3, is the insurer liable only for a prorated portion of the defense costs, or is it jointly and severally liable for the total amount of such costs without proration to the insured (subject to contribution by other insurers)?[7]

The parties have stipulated to all facts material to this court's decision, and no

---

7. Defendant American Home disagrees with the above statement of the issues only insofar as it suggests that coverage extends to continuing personal injury after the disease process *first* manifests itself.

party seeks to submit any evidence extrinsic to the policies not heretofore submitted for assistance in gleaning the parties' intent. Thus, the parties and the court agree that the issues presented are ripe for summary disposition. Similarly, the parties and the court agree that to the extent that plaintiff seeks a declaration of its rights and obligations, a justiciable case or controversy is presented. Plaintiff has been and continues to be sued for injuries that are alleged to have resulted from its asbestos products. For each of these suits the rights and obligations of plaintiff and its various insurers must be determined. Interpretation of the insurance policies at issue presents a "real and substantial controversy admitting of specific relief through a decree of a conclusive character" of this court. *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

 Finally, both the court and the parties agree that New Jersey law should be applied. In a diversity case such as this, the court must apply the conflict of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). New Jersey courts

generally apply the law of the place in which an insurance contract was executed to determine the rights of the parties under that contract unless an analysis of significant competing interests compels a different result. *State Farm Mutual Automobile Insurance Co. v. Simmons' Estate,* 84 N.J. 28, 37, 417 A.2d 488 (1980). In the instant case, it appears that the bulk of the activities covered by the policies took place in New Jersey and that the majority of claims filed against LAQ have been filed in New Jersey. Further, the basic principles governing the interpretation of insurance policies of the interested states in this multi-state action do not conflict in any material way. Accordingly, this court sees no reason to disturb the parties' choice of New Jersey law as controlling this matter, although it will seek to be consistent with the laws of the other interested states.[8]

### III

The personal injury claims against LAQ, like those against any asbestos company, allege that after a period of exposure to asbestos, a plaintiff suffers from one or more asbestos-related conditions, ranging from mesothelioma and other forms of cancer, to asbestosis, to the less disabling conditions known as pleural plaques and pleural thickening.[9] The property damage

---

8. The court notes in passing, however, that defendants could have, but did not, urge that New York law be applied given that defendants American Home and Midland are New York corporations with their principal places of business in New York and the insurance policies were apparently executed in New York. In an analogous DES-related claim, at least one New York court has construed coverage to trigger when the disease becomes manifest, a theory defendants do not ask this court to accept presumably, at least in part, because adoption of that theory would maximize coverage over the exposure theory which defendants advocate. *See American Motorist Ins. Co. v. E.R. Squibb & Sons, Inc.,* 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup.Ct.1978).

9. The parties have agreed that the descriptions of asbestosis and mesothelioma in *Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076, 1083 (5th Cir.1973), *cert. denied* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974) may be taken as accurate for purposes of this case:

[I]nhaling asbestos dust in industrial conditions, even with relatively light exposure, can produce the disease of asbestosis. The disease is difficult to diagnose in its early stages because there is a long latent period between initial exposure and apparent effect. This latent period may vary according to individual idiosyncrasy, duration and intensity of exposure, and the type of asbestos used. In some cases, the disease may manifest itself in less than ten years after initial exposure. In general, however, it does not manifest itself until ten to 25 or more years after initial exposure. This latent period is explained by the fact that asbestos fibers, once inhaled, remain in place in the lung, causing a tissue reaction that is slowly progressive and apparently irreversible. Even if no additional asbestos fibers are inhaled, tissue changes may continue undetected for decades. By the time the disease is diagnosable, a considerable period of time has elapsed since the date of the injurious exposure. Furthermore, the effect of the disease may be cumulative since each exposure to asbestos dust can result in additional tissue changes. A worker's present condition is the biological product of many years of exposure

claims, more fully addressed later, allege, among other things, harm to buildings and other property due to the continuing presence of asbestos products in the buildings.

The feature common to all of these claims is that the alleged harm does not become manifest until years, and often decades, after a plaintiff's initial exposure to asbestos or, with reference to property damage, until years or decades after the original installation of asbestos-containing materials. These claims are, therefore, often referred to as "delayed manifestation claims". The other feature present in virtually all claims is what has become known as a "harmful residence" period—the period of time between the last exposure to asbestos and the discovery of disease in the personal injury cases or between the last act of installation and the discovery of damage in the property damage cases. Thus, as noted by the *Borel* court and as stipulated by these parties in the personal injury context, inhalation of asbestos can produce asbestosis. After the initial inhalation and the lodging of asbestos fibers in the lung, slowly progressive tissue reaction occurs over a long period of time during which the disease is latent. Finally the disease, whether asbestosis or a less disabling condition or mesothelioma or another form of cancer, manifests itself.

Plaintiff and defendants urge that the policies at issue here be interpreted differently. They press upon the court two of the three divergent legal theories which have been adopted by the Courts of Appeals in interpreting virtually identical policies and defining the operative event for determining what is an asbestos-related "injury" and when that injury occurs.

In *Insurance Company of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1222 (6th Cir.1980), *clarified* 657 F.2d 814, *cert. denied* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), the Sixth Circuit held that the obligations imposed upon an insurance company by the CGL policy issued to asbestos producers is triggered by a claim that an asbestos victim was *exposed* to the insured's asbestos containing products during the policy period. Each insurer in *Forty Eight* was liable for its pro rata share of the damages, based upon the length of time it was on the risk in relation to the total period of harmful exposure. *See also Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.) *cert. denied* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

Defendants urge this court to accept the exposure theory [10], arguing that it is only bodily injury from the inhalation of asbestos during the policy period that triggers coverage. Bodily injury, it has been stipulated, includes subclinical insult to lung tissue which can result shortly after inhalation. There is no trigger of coverage, defendants continue, if their policies were in effect only during the latency or "harmful residence" period or at the time of manifestation of the disease because the disease process during latency and the manifestation of the disease are not distinct bodily injuries but, rather, are simply outgrowths of the initial injury caused by the inhalation of asbestos. Neither, they argue, is there any trigger of coverage if the entire inhalation of asbestos predated the policy periods.

It is not surprising that defendants argue the exposure theory given plaintiff's candid admission that those injuries that began long before the purchase of defendants' policies are the very ones that may be expected to produce most of the claims against plaintiff. "The great bulk of the

---

to asbestos dust, with both past and recent exposures contributing to the overall effect. All of these factors combine to make it impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease.

A second disease, mesothelioma, is a form of lung cancer caused by exposure to asbestos. It affects the pleural and peritoneal cavities, and there is a similarly long period between initial contact and apparent effect. As with asbestosis, it is difficult to determine which exposure to asbestos dust is responsible for the disease.

10. Defendants Midland and Highlands have agreed, for purposes of this motion, to follow whatever "trigger" applies to the relevant American Home umbrella policy.

claims against LAQ would thus fall outside the defendants' responsibility unless their policies were triggered by the process of injury that continues after the period of actual exposure. Otherwise stated, if the policies were construed in accordance with the defendants' exposure-only theory, their fundamental function of protection would become an illusion." Pl.Br. at 22.

Plaintiffs, therefore, urge the "continuous trigger" theory adopted by the District of Columbia Circuit in *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). Under that theory, coverage is triggered by a claim that a victim was either exposed to asbestos products, suffered exposure in residence, *or* manifested an asbestos-related disease during the policy period.[11] Because the policies' "trigger"—the occurrence of injury—is a continuing process beginning with the inhalation of asbestos fibers and ending years later with the manifestation of an asbestos-related disease, any insurer whose policy was in effect at any point in this process would be, under this theory, jointly and severally liable for the whole of this single injury with the insurers to determine amounts of contribution among themselves. The *Keene* rationale, in emphasizing the language of the policies and the expectations that the insured, as an objective matter, could reasonably have formed, clearly seeks to ascertain and effectuate the intent of the parties in light of the policies' purpose of indemnity.

Plaintiff argues that each liability policy in effect at any time during the entire course of alleged asbestos-related personal injury or property damage—from the first exposure or installation through the last manifested development of asbestos-related harm—provides full coverage for the claims alleging such harm, subject only to the dollar limits stated in the policy. Defendant Highlands, which was on the risk

for merely six weeks, and the other defendants would, under *Keene* and plaintiff's theory, be responsible up to their policy limits for all the years of plaintiff's mining operations which predate the terms of those policies, responsible for claims that may well extend into the 21st century, and responsible—in a hypothetical case—when the "insured" gambled by carrying no insurance or, as here, minimal insurance, rendering the phrase "policy period" a meaningless term. *See Brinco Mining Ltd. v. Federal Insurance Co.*, 552 F.Supp. 1233, 1236–37 (D.D.C.1982).

The third theory, which is urged by none of the parties in this case, is the "manifestation" theory accepted by the First Circuit, under which coverage is triggered only by a claim that an asbestos disease has actually manifested itself during the policy period. *Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 682 F.2d 12 (1st Cir.1982), *cert. denied* 460 U.S. 1028–29, 103 S.Ct. 1279–81, 75 L.Ed.2d 500 (1983).

In sum, in deciding the critical issue of when bodily injury occurred for purposes of triggering coverage, the exposure theorists argue that bodily injury and the consequent triggering of coverage occurs shortly after the initial inhalation of asbestos and worsens as exposure continues; the continuing injury theorists argue that bodily injury is any part of the injurious process beginning with the initial exposure and ending with manifestation of the disease; and the manifestation theorists argue that bodily injury occurs when the disease actually manifests itself.

## IV

It bears repeating that before this court for interpretation are standardized policies containing policy language virtually identical to that which was before the various courts which have reached differing inter-

---

11. This theory was also accepted in *ACandS*, at least in part to maximize coverage. The Court of Appeals for the Third Circuit affirmed, stating that "it is not our function sitting in diversity to analyze the wisdom of the controlling state

law" and holding that exposure, exposure-in-residence, and manifestation all constitute bodily injury within the meaning of the policies. *ACandS, Inc. v. The Aetna Casualty and Sur. Co.*, 764 F.2d 968, 972–73 (3d Cir.1985).

pretations while relying on the same basic principles of contract construction and insurance law, i.e. that the policy was to be construed against the insurer, ambiguities were to be resolved in favor of the insured, and clear and unambiguous terms were to be given their plain and commonplace meaning.[12]

> The reason for this seemingly anomalous result is that each court considered the case of a different asbestos company which had purchased liability insurance at a different stage in its asbestos product-line development. Each of the courts, however, subjected the policies to an interpretation designed to "promote coverage" and to fulfill the "dominant purpose of [providing indemnification]." In a word, each court sought to "maximize coverage" for the insured. (citations and footnote omitted).

*ACandS, Inc. v. Aetna,* 576 F.Supp. at 940.

As one commentator has observed, "The real question the courts have answered is not whether one theory is correct as a matter of law, but whether it is most favorable to the insured in light of when in its manufacturing stage it obtained liability insurance. In this regard, 'exposure' and 'manifestation' may not be legal theories at all, but merely labels for the desired result of maximizing insurance coverage." Note, 97 Emory L.J. at 929–30. The medical evidence in *Forty Eight* and *Eagle-Picher* supported those results with the *Forty Eight* court noting that bodily injury, in the form of lung tissue damage, occurred at or substantially contemporaneously with the initial inhalation and continued progressively thereafter, and the *Eagle-Picher* court noting that the medical evidence demonstrated that exposure to asbestos fibers and injury did not occur at those times.

Here, for example, as in *Eagle-Picher,* acceptance of the exposure theory would almost totally deprive plaintiff of coverage, at least by these defendants. In *Keene,* however, acceptance of only the manifestation theory as the trigger of coverage would have required the insurance companies to bear only a fraction of the Keene Corporation's total liability for asbestos-related diseases. It is not difficult to posit another case in which the Keene Corporation's forthright effort to maximize coverage would be deemed to be unjust because, given the absolute monetary limits of insurance policies, claims that would have been wholly covered under a narrow interpretation of the policy language would be covered only in part or not at all were the policy limits exhausted in satisfying claims under a broader construction of the policy language than was mandated. Thus, where relevant terms in virtually identical policies are found to be ambiguous, as they almost always have been,[13] ambiguities, such as the failure to define the method by which coverage is triggered, are, in accordance with applicable law, construed in favor of the insured.

■ As noted earlier, the operative policy provisions at issue here are by stipulation deemed to be the same as the provisions considered by those courts which have reached these varying results and by stipulation conceded to be "susceptible to more than one interpretation". As applied in the insidious disease context, these provisions are ambiguous in that they fail to articulate with any precision a point in the lengthy development of an insidious disease at which coverage is triggered.[14] More precisely, while the language of the policies indicates no intention to exclude from coverage diseases with long gestation periods, neither does that language state whether it is exposure, exposure in residence, manifestation or all three which trig-

---

**12.** One result: INA was a party in both the *Forty Eight* and *Keene* cases with the identical policies setting forth identical coverage affording, after the decisions in those cases, extraordinarily different coverage. Similarly, under the identical insurance policy differences in coverage may well result between states within a single circuit.

**13.** But see *Eagle-Picher,* 682 F.2d at 18, which notes that the district court accepted the parties agreement that the relevant policy language was unambiguous.

**14.** The parties have stipulated that, at the time the policies were executed, there had been no negotiations or discussions regarding the trigger of coverage.

ger coverage. Consequently, this court must interpret the language of the policies and consider, where appropriate, contract principles, medical evidence, insurance law, and public policy ramifications in reaching a decision as to which insurer or insurers are potential indemnitors of the insured, with the trigger of coverage turning on the meaning of the phrase "bodily injury".

█ Given the stipulated and otherwise undisputed relevant facts in this action, most particularly the proposition that bodily or "personal injury" in the policies includes any pathological changes to the human organism, including internal, non-observable tissue damage and includes subclinical insult to lung tissue which can result shortly after inhalation; given the basic principles of contract and insurance law which apply; and given the fact that no New Jersey court has yet to decide which operative event constitutes an asbestos-related injury,[15] this court predicts that were this case before the Supreme Court of New Jersey for decision, the Supreme Court would construe these ambiguous policies in favor of the insured and, following *Keene,* declare that exposure, exposure in residence, and manifestation each trigger coverage under the policies.[16]

Support for this conclusion is found in per curiam affirmances by both the Appellate Division and the Supreme Court of New Jersey "substantially for the reasons expressed" in the unpublished opinion of the trial judge which the Supreme Court set forth, in pertinent part, as its opinion. *Hartford Accident & Indemnity Co. v. Aetna Life & Casualty Insurance Co.,* 98 N.J. 18, 483 A.2d 402 (1984). The case involved a claim on a liability policy for the amount paid in satisfaction of a judgment for failing to adequately warn of the dangers of the drug Atropisol, the ingestion of which was a proximate cause of a child's physical injuries. It did not involve questions of whether there was coverage or how best to maximize coverage; rather, the question presented was which of two policies covered the claim. Aetna's policy was in effect when the drug was dispensed and administered but no actual bodily injury manifested itself until eleven days after the Aetna policy had expired and after the time when Hartford had assumed coverage. Therefore, the court found, Aetna's policy provided no coverage for the injuries because the injuries suffered were not in the nature of a "bodily injury ... to which this insurance applies...." caused by an occurrence "including injurious exposure to conditions, which result, during the policy period, in bodily injury...."

Coverage turned on whether bodily injury had occurred prior to the expiration of Aetna's policy, but there was no evidence to that effect and no evidence to show that the harm from the administration of Atro-

---

**15.** There has been interpretation by New Jersey courts of phrases such as "bodily injury" and "trigger of coverage" in the asbestos context and contexts analogous to it in cases construing statutes of limitations and workmen's compensation laws. *See, e.g., Biglioli v. Durotest Corp.,* 44 N.J.Super. 93, 129 A.2d 727 (App.Div.1957) (finding it unnecessary to decide for purposes of workmen's compensation and statute of limitations whether to establish an injury there must be proof of an impairment of bodily function or merely proof of inhalation of beryllium dust causing some cellular process to take place in the body which might or might not result in an impairment at a later time); *Hughes v. Eureka Flint etc. Co., Inc.,* 20 N.J.Misc. 314, 26 A.2d 567 (Cir.Ct.1939). But as the Court of Appeals for the Third Circuit noted, such cases are not particularly relevant to a trigger of coverage issue because the phrase "bodily injury" operates differently in the context of statute of limitations and workmen's compensation issues. *ACandS*

*v. Aetna,* at 971. It noted that for statute of limitations purposes, for example, manifestation of the disease has generally been deemed to be the time of "injury" because to do otherwise would result in the barring of claims even before plaintiffs knew of their existence. *See also Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 942 (3d Cir.1985) ("We believe ... that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law").

**16.** *Forty Eight Insulations,* a pre-*Keene* case, construed CGL policies to determine whether the exposure or manifestation theory would determine the extent of coverage. The court applied New Jersey law to broadly construe the policies to promote coverage and adopted the exposure theory.

pisol was cumulative and progressive. Distinguishing *Porter v. American Optical Corp.* and *Insurance Company of North America v. Forty-Eight Insulations, Inc.*, raised by Hartford in support of its exposure theory, the court observed that in those cases there was expert testimony that each inhalation of asbestos into the lungs caused bodily injury which is immediate and progressively more harmful. The existence of coverage, the court concluded, required a showing that the child actually suffered bodily injury on or before the date Aetna's policy expired, a conclusion supported by a solid line of authority in New Jersey.[17] Had there been such a showing, as here there has been by virtue of stipulation, it appears that the court would have had little difficulty in adopting the exposure theory which, as Judge Sarokin aptly observed in *Sandoz, Inc. v. Employer's Liability Assurance Corp.*, 554 F.Supp. 257, 266 (D.N.J.1983), is more accurately labeled the "injury theory". And clearly, given the evidence of actual injury during the Hartford policy period and the emphasis on the failure to produce evidence of injury during the Aetna policy period, had the *Keene* theory been before the court it would most likely have been adopted, particularly had this been a case of maximizing coverage.

This court's determination that the Supreme Court of New Jersey would apply the *Keene* theory is supported, as well, when New Jersey's rules of construction of insurance contracts are applied. New Jersey law provides that insurance contracts are to be liberally construed in favor of the insured and against the insurer. *Last v. West American Co.*, 139 N.J.Super. 456, 354 A.2d 364 (App.Div.1976). If there are ambiguities in the insurance contract, or uncertainty over its interpretation, the contract is to be construed against the insurer and in favor of the insured. *Bryan Construction Co. v. Employer's Surplus Lines Insurance Co.*, 60 N.J. 375, 290 A.2d 138 (1972).[18] To construe the policies at issue in this case in favor of the insured requires the application of *Keene*. Moreover, as a general matter, *Keene* provides certainty of coverage unlike the exposure and manifestation theories in which coverage is triggered only at specified points in the injurious process. To the extent the Supreme Court would wish to provide certainty, it would follow *Keene*.

V

■ The parties reiterate their respective positions as to the trigger of coverage for bodily injury with reference to the trigger of coverage for property damage claims, a rapidly burgeoning area of prospective liability particularly in the school context.[19] These positions are reiterated presumably because, again, adoption of *Keene* would maximize plaintiff's coverage and adoption of the exposure theory would minimize plaintiff's coverage "in light of the fact that most installations may be

17. *See, e.g., Deodato v. Hartford Ins. Co.*, 143 N.J.Super. 396, 363 A.2d 361 (Law Div.1976) *aff'd* 154 N.J.Super. 263, 381 A.2d 354 (App.Div. 1977); *Muller Fuel Oil Co. v. Ins. Co. of North America*, 95 N.J.Super. 564, 232 A.2d 168 (App. Div.1967).

18. Where the language of an insurance policy is ambiguous, so long as the insured's reading is not unreasonable, that reading will prevail. 13 J.A. & J. Appleman, *Insurance Law and Practice* (Rev.Ed.1976) at 312–13. The relative size and bargaining power of the parties is not an issue in this case.

19. The parties have stipulated that in the asbestos property suits pending against plaintiff as of December 31, 1983, the damage alleged includes the following:

(a) physical damage and related cost arising from inspection, restoration, replacement, removal, repair, and/or encapsulation of asbestos products in buildings;
(b) loss of use of property during the period required for repair, removal, replacement, restoration, and/or encapsulation of asbestos products in buildings;
(c) reduction in value of property due to the presence of asbestos products in a building;
(d) physical damage to a building due to the continuing presence of asbestos products in the building;
(e) loss of use of property due to the continuing presence of asbestos products in a building.

expected to have occurred long before [AHAC's] coverage began". (Pl.Br. at 33).

Plaintiff argues that the continuing presence of asbestos products in a building causes continuing damage and, thus, that coverage should be triggered during the entire period from installation through removal or containment of the asbestos. The policies, it continues, do not confine property damage to any particular point in time or phase in a damage process that occurs over time and, because the harm continues during the entire period, the clear meaning of the policies mandates the triple trigger of coverage. If the meaning of the policies is deemed to be less than clear, plaintiff argues that general principles of insurance law would compel the same result.

Defendants once again argue the exposure theory albeit denominating the injury that asbestos products cause as having occurred at the installation of those products. Unlike bodily injury, they continue, an asbestos property damage claim has no latency period and the fact and time of damage, the determining factors in triggering coverage, can be established with precision as having occurred at installation with the passage of time having no effect on the intrinsic hazardous characteristics of asbestos. Mere continuation of the presence of asbestos in a building, they conclude, is a consequence of the installation and does not constitute new damage so as to trigger coverage any more than does containment or removal.

Under New Jersey law what has been described, in the asbestos context, as the manifestation theory would be applied in the usual property damage case. Thus, the trigger under CGL policies is held in New Jersey to be damage during the policy period and not a negligent act during the policy period that later caused damage. *See, e.g., Middle Department Inspection Agency v. The Home Insurance Co.,* 154 N.J.Super. 49, 380 A.2d 1165 (App.Div.1977), *cert. denied* 76 N.J. 234, 386 A.2d 858 (1978) (negligent building inspection in 1970; fire in 1973 caused by faulty wiring; no damage in 1970 during policy period); *Deodato v. Hartford Insurance Co.,* 143 N.J.Super. 396, 363 A.2d 361 (negligent construction

of roof during policy period; trigger of liability was destruction of roof years later). Analogizing here, the injury triggering liability would be, for example, the ripping out of asbestos from walls *unless* it can be said that "injury" or damage actually occurred at some earlier point in time.

Similarly, the continuing injury concept is not novel in the non-asbestos context, and indemnity coverage of a series of liability policies for injuries which are no more divisible or obvious than those in asbestos property claims is regularly found to be joint and several. *See,* e.g., *California Union Ins. Co. v. Landmark Ins. Co.,* 145 Cal.App.3d 462, 193 Cal.Rptr. 461 (1983) (water seepage); *Gruol Constr. Co. v. Insurance Co. of North America,* 11 Wash. App. 632, 524 P.2d 427 (1974) (dry rot). *And see Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.,* 98 N.J. 18, 483 A.2d 402 (1984).

Implicit in the theories they press is the parties' agreement that injury or damage occurs at the time of installation. The only question is whether the injury or damage was complete at installation with anything that followed merely flowing naturally from that injury, as defendants urge, or whether that installation was the initial step in a single continuous injurious process, as plaintiff urges. The question posed more simply is simply this: whether the damage is confined to a discrete act or whether damage is continuous. We thus return to where we began and ask again: "What is the injury that triggers coverage?"

There appear to be no decisions of any court to date that have addressed the issue of the trigger of coverage for asbestos related property claims and the parties have presented little beyond argument to this court. Separate and apart from the fact that it would be illogical and impractical to provide a triple trigger in bodily injury cases but only a single trigger in property damage cases, what is before the court strongly suggests that the *Keene* theory would be adopted by the Supreme

Court of New Jersey in the property damage context as well.

It is true, as defendants suggest, that asbestos containing materials may degrade and release asbestos fibers into the air where they may be inhaled and cause bodily injury. It is not true, as defendants also suggest, that what is at issue here are two discrete points in time—installation and repair or removal—with all that is in between merely "continued presence" causing no new damage to the property itself. It is recognized that there is a natural deterioration of asbestos-containing materials resulting in the release of fibers, release that may occur by a slow continuous degradation of the insulating surface which may be accelerated by the air movement and vibration which occurs in most buildings. *Guidelines for Assessment and Abatement of Asbestos-Containing Materials in Buildings,* United States Department of Commerce, National Bureau of Standards, Center for Building Technology, May 1983, prepared for General Services Administration, Office of Design and Construction, Public Buildings Service, No. NBSIR 83-2688 at 233. More specifically, friable asbestos material breaks down as a result of vibrations, deterioration, or direct contact and damage and, as it ages, it can lose its cohesive strength. Fallout of fibers from deteriorating material is continuous. *The Attorney General's Asbestos Liability Report to the Congress,* United States Department of Justice, Land and Natural Resources Division, Sept. 21, 1981 at 46–47.[20]

As the court concluded in *Town of Hooksett School District v. W.R. Grace & Co.,* 617 F.Supp. 126 (D.N.H.1984):

The asbestos was but a single ingredient of the acoustical insulation and fireproofing spray applied to the school. Yet, it managed to contaminate the remainder of the insulator, the curtain, walls and carpets of the school among other things. Such contamination constitutes a physical injury to Plaintiff's premises; where a defect in Defendant's product—i.e., the asbestos—creates a cognizable safety hazard, the resulting injury to property is as actionable in strict liability and negligence as personal injury resulting from the defect would be.

*Id.* at 131. Implicit if not explicit in this conclusion is the fact that the injury to property caused by asbestos is both continuous and progressive and certainly not complete upon the act of installation.[21]

Thus, while property damage is not, of course, an insidious disease, many of the same considerations apply. Those considerations lead to the conclusion that property damage in the asbestos context is as imprecise of definition as is "bodily injury", a term which the Third Circuit observed "simply lack[s] the precision necessary to identify a point when physical damage or debility occurred so as to determine adequately at what time coverage was triggered." *ACandS v. Aetna,* at 972.

## VI

The issues as to the appropriate trigger of coverage for personal injury and property damage claims having been resolved, the remaining issues reach resolution swiftly.

■ First, it having been determined that coverage is triggered if any part of continuing personal injury or property damage occurred during the policy period, losses among the respective policies must be allocated when coverage under more than one policy has been triggered in a particular case. As the parties phrase the

---

**20.** In the school context, friable asbestos-containing materials have been used for fireproofing and thermal and acoustical insulation, and are commonly found on steel support beams and columns, on the ceilings of classrooms, corridors, auditoriums, cafeterias, machine shop rooms, and storage rooms. They may also be found on overhead surfaces of indoor pools and gymnasiums. *Id.* at 47.

**21.** Although it does not address the trigger of coverage for asbestos related property claims, *Hooksett School District* is the only opinion of which the court is aware which addresses in any respect the issue of asbestos related property claims. It is, nonetheless, of limited utility, given the fact that the opinion is unpublished and the fact that it emanated from a motion pursuant to Fed.R.Civ.P. 12(b)(6) with the limited scope of review that rule provides.

question, is the insurer liable for only a prorated portion of the amount of the settlement or judgment or is it jointly and severally liable for the total amount without proration to the insured, but subject to contribution by other insurers?

The umbrella policies provide that payment on behalf of the insured shall be "the total sum which the Insured ... become[s] obligated to pay by reason of personal injury [or] property damage ... claims." The plain language of these policies requires that each triggered policy shall respond in full. The Third Circuit, construing near-identical language to reach an identical result, determined that the district court did not err in deciding that, subject to the possible effect of "other insurance" clauses, there is *no proration of losses under a policy once coverage is triggered.* *ACandS v. Aetna,* at 974:

> The policies require the insurers to pay all sums which AC and S becomes 'legally obligated to pay' because of bodily injury during the policy period. It is uncontested that under principles of tort law AC and S may be held fully liable for a personal injury plaintiff's damages caused in part by AC and S' asbestos during a particular period, even though plaintiff's damages may have been caused, in part, at other times.... It follows that if a plaintiff's damages are caused in part during an insured period, it is irrelevant to AC and S' legal obligations and, therefore, to the insurer's liability that they were also caused, in part, during another period. *See Keene,* 667 F.2d at 1047–49. We think the Supreme Court of Pennsylvania would agree.[22] (citation omitted)

*Id.* at 974.

For reasons even beyond the plain language of the policies, this court believes that the Supreme Court of New Jersey would agree as well. First, as the *Keene* court reasoned in going beyond its holding that under the plain language rule full payment of the insured's loss, without proration, was required, any proration of liability as against the insured would contravene the policies' dominant purpose of protection:

> The policies that were issued to [the insured] relieved [it] of the risk of liability for latent injury of which [it] could not be aware when it purchased insurance. [The insured] did not expect, nor should it have have expected, that its security was undermined by the existence of prior periods in which it was uninsured, and in which no known or knowable injury occurred. If, however, an insurer were obligated to pay only a pro-rata share of [the insured's] liability, as the district court held, those reasonable expectations would be violated.

667 F.2d at 1047–48.

There was nothing in the *Keene* policies, as there is nothing here, that provides for a reduction in liability if an injury occurs only in part during a policy period.

Moreover, plaintiff points to the pernicious effect that proration would have in this case. All the AHAC umbrella policies have substantial deductibles, reaching as high as $3,000,000. Prorating each claim over many policy periods merely prorates it over many years of deductibles and, plaintiff argues, with only a miniscule portion of each claim counting toward the exhaustion of the retained limit in each period, defendants' policies would effectively remain insulated from loss. Plaintiff, in other words, would be "place[d] ... in the role of a modern-day Tantalus, with an insurance program dangling forever out of its reach." (Pl.Br. at 26) This, I predict, the Supreme Court of New Jersey would not permit.

Finally, given the fact of the indivisible nature of an asbestos-related injury it is, the parties have agreed, "impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease," and "[t]here exist at present no medical techniques capable of specifical-

**22.** Unlike the Keene Corporation which was voluntarily uninsured during its early years of asbestos production and thus, as Judge Wald persuasively argued in her concurring opinion, should not be exempt from liability for injuries occurring during those years, plaintiff has been insured since its entry into the field.

ly identifying and quantifying the portion of asbestos-related injury, sickness or disease actually sustained in each year from and after a first inhalation of asbestos." *Cf. Sandoz,* 554 F.Supp. at 266. One wonders if proration, even if desirable, would be possible.

For all of these reasons, this court believes that the Supreme Court of New Jersey would impose a joint and several coverage obligation for the full amount of plaintiff's loss to be collected from any insurer whose coverage is triggered, subject to contribution or in accordance with any "other insurance" clauses in the policies.

The final questions before the court are 1) whether coverage for the costs of defending an asbestos related claim are triggered only if the exposure to or installation of asbestos potentially falls within the policy period or if coverage is triggered if any part of the continuing personal injury or property damage potentially falls within the policy period, and 2) once the trigger of defense coverage has been established, is the insurer liable for only a prorated portion of defense costs or is it jointly and severally liable for the total amount of such costs without proration to the insured but subject to contribution by other insurers.

■ The umbrella policies contain the standard CGL "duty to defend" clause which provides that the insurer will

defend any suit against the Insured alleging liability insured under the provisions of this policy and seeking recovery for damages on account thereof even if such suit is groundless, false or fraudulent....

It is clear that the duty to defend extends only to claims within the coverage of the policy—claims on which there would be a duty to indemnify upon a judgment adverse to an insured. *Burd v. Sussex Mutual Insurance Co.,* 56 N.J. 383, 267 A.2d 7 (1970); *Williams v. Bituminous Casualty Corp.,* 51 N.J. 146, 238 A.2d 177 (1969). It is also clear that while liability may never eventuate, defense costs are inevitable.

■ Here, where it has been determined that each insurer is fully liable to plaintiff

for indemnification, "it follows" that each is fully liable for defense costs without proration to the insured and subject to contribution or in accordance with any "other insurance" clauses in the policies. *See Keene,* 667 F.2d at 1050. Unless a complaint on its face precludes the possibility that any portion of the continuous process of injury fell within the policy period of a policy, that policy creates an obligation for the entire cost of defense against the claim. When more than one insurer was on the risk during this period of continuous injury, they are jointly and severally liable to plaintiff for costs of defending the suit.

### VII

And so one more decision joins the existing plethora of decisions which have addressed these difficult and important issues. Plaintiff's motion for summary judgment is granted. Defendants' cross-motions for summary judgment are denied.