**DAYTON INDEPENDENT SCHOOL DISTRICT, et al., Plaintiffs,**

v.

**NATIONAL GYPSUM CO., et al., Defendants.**

**W.R. GRACE & CO., Defendant and Third–Party Plaintiff,**

v.

**CONTINENTAL CASUALTY CO., et al., Third–Party Defendants.**

Civ. A. Nos. B–81–227–CA, B–81–293–CA and B–87–701–CA.

United States District Court, E.D. Texas, Beaumont Division.

Feb. 4, 1988.

Charles Dewey Cole, Jr., Newman, Schlau, Fitch & Burns, Jerold Oshinsky, Randy Paar, Anderson Russell Kill & Olick, P.C., New York City, for third-party plaintiff, W.R. Grace & Co.

Kerry L. Neves, Mills, Shirley, Eckel & Bassett, Galveston, Tex., for Continental Cas. Co.

Hubert Oxford, III, Benckenstein, Oxford, Radford & Johnson, Beaumont, Tex., for Lexington Ins. Co.

R. Jeff Carlisle, Lyndberg & Watkins, Los Angeles, Cal., for AIU Ins. Co., Birmingham Fire Ins. Co., Granite State Ins. Co., and Nat. Union Fire Ins. Co. of Pittsburgh.

L.S. Carsey, Fulbright and Jaworski, Houston, Tex., for Certain Underwriters at Lloyds, London and London Market Ins. Companies.

G. Patrick Black, Hawthorne & Black, Beaumont, Tex., for Allstate Ins. Co.

Gordon R. Pate, Pate & Dodson, Beaumont, Tex., for the Hartford Acc. & Indem. Co.

Stephen F. English, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for Guarantee Ins. Co.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

### INTRODUCTION

This insurance coverage dispute concerns questions of coverage for claims of asbes-

tos-related property damage. Presently before the Court is the motion for summary judgment of Defendant and Third–Pardy Plaintiff W.R. Grace & Co. ("Grace"). The issue of coverage is a question of contract construction and, thus, can be decided by this Court as a matter of law. Having reviewed the contracts, and there being no other genuine issue of material fact, Grace's motion for summary judgment is granted.

## BACKGROUND

Prior to 1974, Grace and its predecessors and affiliates were in the business of manufacturing and distributing various construction and building products, including those containing asbestos. Third–Party defendants sold primary and excess liability insurance policies to Grace between 1978 and 1985 in the aggregate amounts of approximately $75 million for each annual policy period. Third-party defendant Continental Casualty Company ("CNA") sold primary comprehensive general liability insurance to Grace for each policy year.[1] In addition, Grace purchased excess liability insurance from the other eleven third-party defendants.[2]

In April of 1984, Grace was named as a defendant in an action brought by 83 school districts ("Plaintiffs") located throughout the State of Texas (the "Main Action").[3] Plaintiffs had constructed or renovated approximately 600 school buildings, allegedly using asbestos-containing building materials supplied, in part, by Grace.

Plaintiffs claimed that the presence and incorporation of Grace's asbestos-containing products contaminated and damaged their school buildings because they continuously released, or threatened to release, asbestos fibers into the buildings over extended periods of time, damaging the buildings and causing health hazards to the buildings' occupants. According to Plaintiffs' allegations, the release or threatened release of asbestos fibers continued up to and including the time that Plaintiffs brought suit against Grace, thus encompassing the time during which the liability insurance policies sold to Grace by the Carriers were in effect. Plaintiffs' complaint sought in excess of $175,000,000 in compensatory damages. Upon receipt of Plaintiffs' summons and complaint in 1984, Grace timely notified its insurance carriers of the pendency of the litigation. At that time, none of the Carriers either reserved their rights or denied coverage.

In January of 1987, the Court ordered that an initial trial, involving five school districts, would begin in May of 1987. As this trial date approached, Grace and the Plaintiffs engaged in settlement negotiations. During the course of these negotiations, Grace notified its carriers of Plaintiffs' settlement offer and, as it had done previously, sought their participation in trial preparation and settlement negotiations. Grace also renewed its demand that its insurance carriers provide coverage for any judgment entered or settlement negotiated in the Main Action. None of Grace's insurance carriers agreed to participate in the

1. CNA has not filed any substantive opposition to Grace's motion, but instead has invited the Court to decide the motion based upon the Court's assessment of the other parties' arguments.

2. These excess carriers are: AIU Insurance Company; Allstate Insurance Company (as successor to Northbrook Excess and Surplus Lines); Bermuda Fire and Marine Insurance Company; Birmingham Fire Insurance Company; Certain Underwriters at Lloyds, London and London Market Insurance Companies ("London"); Gerling Knozern Allegmeine Versicherungsaktiengesellschaft ("Gerling"); Granite State Insurance Company; Guarantee Insurance Company ("Guarantee"); Hartford Accident & Indemnity Company ("Hartford"); Lexington

Insurance Company; and National Union Insurance Company of Pittsburgh (collectively the "Carriers"). Service under the Hague Convention upon Gerling, a foreign party, has not yet been perfected. Consequently, summary judgment may not be entered against Gerling. Grace also purchased liability coverage before 1978 and from 1978 through 1985 in excess of the policies at issue in this case.

3. The action was captioned *Dayton Indep. School Dist. v. W.R. Grace & Co.,* No. B–81–293–CA (E.D.Tex.). At all relevant times, this Court presided over the Main Action and is thoroughly acquainted with the positions of the parties, the discovery taken and the evidence developed in the Main Action, as well as the third-party action.

negotiations or to indemnify Grace for sums paid in settlement. At the same time, none of the carriers formally disclaimed coverage or reserved their rights.

In April of 1987, Grace filed its third-party complaint against the Carriers. The third-party complaint sought indemnification from the Carriers for all amounts paid by Grace to the Plaintiffs as a result of the Main Action.[4] Grace and the Plaintiffs have agreed to the settlement of all of the Plaintiffs' claims. Grace now seeks an order of summary judgment directing the Carriers to indemnify Grace for the costs incurred by Grace in the defense and settlement of the Main Action.

## DISCUSSION

### I.

### PRELIMINARY MATTERS

#### A. *Choice of Law*

No significant choice of law question is presented by Grace's summary judgment motion where, as here, the basic principles of policy construction in each jurisdiction are the same. *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1041 n. 10 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) ("*Keene*"). Although the Carriers urge this Court to apply New York law, in both Texas and New York the principles of policy construction are the same: ambiguities in an insurance policy are strictly construed against the insurance company and in favor of the policyholder; insurance contracts are construed to foster the policies' dominant purpose of indemnity; and exclusions and exceptions are interpreted narrowly, resolving all doubts in favor of the policyholder.[5] Further, courts in both Texas and

New York recognize the doctrine that the interpretation of an insurance policy should honor the objective reasonable expectations of the policyholder.[6] Moreover, with regard to the trigger-of-coverage question, the only specific issue as to which the Carriers assert a conflict exists, no choice of law is required. Both New York and Texas law trigger successive policies where injury or damage took place while those policies were in effect.[7]

#### B. *The effect of Settlement Upon The Coverage Issues*

The general rule is that an insurance company which denies coverage is liable to indemnify its policyholder for sums paid in settlement where the underlying *claim* is within the policy coverage. *See Parker Prods., Inc. v. Gulf Ins. Co.*, 486 S.W.2d 610 (Tex.Civ.App.—Fort Worth 1972), *aff'd*, 498 S.W.2d 676 (Tex.1973). This rule applies not only where the carrier has breached its duty to defend but also where the carrier has wrongfully refused to settle. *Id.* In determining whether the claim is within coverage, the nature of the third party's *claim* is determinative, and not the actual facts underlying that claim. *Winn v. Continental Casualty Co.*, 494 S.W.2d 601 (Tex.Civ.App.—Tyler 1973, no writ). A policyholder, therefore, does not have to prove its actual liability as a prerequisite to obtaining coverage. As the Second Circuit recently held in *Luria Bros. & Co. v. Alliance Assurance Co., Ltd.*, 780 F.2d 1082 (2d Cir.1986):

> When an insurer declines coverage, as here, an insured may settle rather than proceed to trial to determine its legal liability. In order to recover the amount of the settlement from the insurer, the

**4.** This Court has jurisdiction over Grace's third-party claim by virtue of the doctrine of ancillary jurisdiction, even though complete diversity does not exist between Grace and the Carriers. *See United States v. O'Neil*, 709 F.2d 361, 368 (5th Cir.1983).

**5.** *Compare, e.g., First Nat'l. Bank v. Protective Life Ins. Co.*, 511 F.2d 731 (5th Cir.1975) *with Vargas v. Insurance Co. of N.Am.*, 651 F.2d 838 (2d Cir.1981).

**6.** *Compare Kulubis v. Texas Farm Bureau Underwriters Ins. Co.*, 706 S.W.2d 953 (Tex.1986)

*with Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 358 N.E.2d 258, 389 N.Y.S.2d 565 (1976).

**7.** *Compare National Standard Ins. Co. v. Continental Ins. Co.*, No. CA-3-81-1015-D (N.D.Tex. Oct. 4, 1983) *with National Casualty Ins. Co. v. City of Mount Vernon*, 128 A.D.2d 332, 515 N.Y. S.2d 267 (2d Dep't 1987) *and McGroarty v. Great Am. Ins. Co.*, 43 A.D.2d 368, 351 N.Y.S.2d 428 (2d Dep't 1974), *aff'd*, 36 N.Y.2d 358, 329 N.E.2d 172, 368 N.Y.S.2d 485 (1975) ("*McGroarty*").

insured need not establish actual liability to the party with whom it has settled so long as … a potential liability on the facts known to the insured is shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured.

780 F.2d at 1091–92 (brackets, citations and quotation marks omitted).

Here, the record demonstrates that, at the time Grace agreed to the settlement of the Plaintiffs' claims, it was aware of its potential for liability.[8] This Court finds that the settlement of the Main Action was reasonable. Thus, the only question remaining is whether the claim asserted by Plaintiffs describes a type of claim covered by the policies. In ruling on this issue, the Court has reviewed not only the complaint, but also the entire record of the underlying suit and the third-party action.

## II.

### COVERAGE ISSUES

The operative language of each of the excess liability insurance policies before the Court is virtually identical.[9] In relevant part, the insuring agreements contained in the policies provide that the Carriers are obligated to indemnify Grace for "all sums" which Grace shall be obligated to pay by reason of liability for "damages" on account of "property damage" caused by or arising out of an "occurrence." The manner in which each of these identified terms provides coverage to Grace is discussed below.

### A. "Property Damage"

The policies define "property damage" as the:

loss or direct damage to or destruction of tangible property (other than property owned by the named insured).

The underlying complaint clearly alleges that Grace's products, both by their presence in Plaintiffs' buildings and by their gradual deterioration, have caused damage to Plaintiffs' buildings, including physical injury. The Complaint alleges, *inter alia:* (i) that Grace's products "have caused asbestos fibers to invade and damage the … floors, carpets, upholstery, light fixtures, window sills, desks and other physical property" and that "the presence and incorporation of said products into the constructed buildings has damaged the buildings" (¶ VI); and (ii) that the necessary removal and abatement of Grace's products from the school buildings would "cause damage to Plaintiffs' property" (¶ V).

■ Thus, for purposes of insurance coverage, the nature of Plaintiffs' claim is that of property damage caused by the presence and incorporation of Grace's product into the buildings and the deterioration of those products. This Court already has recognized, in the context of the underlying cases, that Plaintiffs' claims were for property damage. *Dayton Indep. School District v. W.R. Grace & Co.*, No. B–81–277–CA, *consolidated with* No. B–81–293–CA (E.D.Tex. Jan. 26, 1987), at 4. There has been no evidence presented since that time to change this determination.[10]

Grace purchased an insurance policy to protect it from liability on account of prop-

---

**8.** Indeed, at the time of the settlement, Grace had already suffered adverse verdicts in other asbestos-related property damage lawsuits. Accordingly, Grace reasonably could have anticipated potential liability to the Plaintiffs.

**9.** The excess policies all "follow form" to, or incorporate by reference, the terms and conditions of the so-called "umbrella" liability policies sold to Grace by London, which provide coverage immediately excess to the primary comprehensive general liability policies sold to Grace by CNA. For the Court's purposes, to the extent that any of the policies at issue in this case deviate from the language of the London policies, such deviation is insignificant.

**10.** That Plaintiffs' claim falls within the meaning of "property damage" is further evidenced by an analysis of that term undertaken by certain members of the insurance industry. L. Carsey, L. Zimmerman, R. Burgoyne, S. McNabb, *Asbestos Property Damage Lawsuits: A Discussion of the Relevant Case Law on the Question of Insurance Coverage,* (the "Fulbright & Jaworski Memo") June 23, 1983. The Fulbright & Jaworski Memo concluded that most courts would probably hold that asbestos-related property damage claims virtually identical to those before this Court were "property damage" and would trigger the duty to indemnify. *Id.* at 3.

erty damage. Having been sued on a theory of property damage by Plaintiffs and having incurred liability through settlement as a result thereof, Grace could reasonably expect its liability to be covered by the policies' definition of property damage. Therefore, the property damage alleged by Plaintiffs constitutes "direct damage to tangible property," and comes within the definition of property damage set forth in the policies.[11] Numerous courts have held, in analogous situations, that the incorporation of allegedly dangerous, defective or malfunctioning products or components in a building or other structure constitutes property damage which is covered by insurance.[12]

### B. "Occurrence"

#### 1. "Expected and Intended"

The policies define "occurrence" as:

an accident or a happening or event or a continuous or repeated exposure to conditions which *unexpectedly and unintentionally* results in ... property damage ... during the policy period.

(Emphasis added). Thus, an occurrence takes place where the resulting injury or damage was unexpected and unintended, regardless of whether the policyholder's acts were intentional. The proper interpretation of the equivalent phrase "neither expected nor intended" was recently considered by the Court in *Asbestos Insurance Coverage Cases*, Judicial Council Coordination Proceedings No. 1072, slip op. at 71–77 (Cal.Super.Ct. May 29, 1987) ("*Asbestos Insurance Coverage Cases*"). In adopting the majority rule, the court determined:

that the "neither expected nor intended" clause applies [only] where the insured acted either willfully, intentionally or maliciously *for the purpose of causing injury.*

Slip op. at 74 (emphasis added). Both Texas and New York law are in accord. *See, e.g., Orkin Exterminating Co., Inc. v. Massachusetts Bonding and Insurance Co.,* 400 S.W.2d 20 (Tex.Civ.App.—Houston [1st Dist.] 1965), *rev'd on other grounds,* 416 S.W.2d 396 (Tex.1967); *McGroarty v. Great Am. Ins. Co.,* 36 N.Y.2d 358, 329 N.E.2d 172, 368 N.Y.S.2d 485 (1975) ("*McGroarty*").

■ In the present case, the nature of the settled claim, which controls the Carriers' duty to indemnify, does not involve a theory that Grace intended to cause property damage. Although Plaintiffs initially asserted claims of intentional tort, they had abandoned these theories by the time of the settlement. The Carriers bear the burden of proving that Grace expected and intended to cause the damages claimed by Plaintiffs.[13] They have neither argued that Grace intended to cause property damage nor come forward with evidence of such intent. Consequently, they have failed to demonstrate the existence of a genuine issue of material fact on this point.[14]

---

**11.** The fact that asbestos-containing materials were incorporated into Plaintiffs' buildings is undisputed. Nor is there any dispute as to the reasons for the removal or containment of those materials. As shown above, questions of whether and to what extent structural damage has taken place in Plaintiffs' buildings are irrelevant. Therefore, there are no genuine issues of material fact sufficient to preclude summary judgment.

**12.** *See e.g., Goodyear Rubber & Supply Co., Inc. v. Great Am. Ins. Co.,* 471 F.2d 1343 (9th Cir. 1973); *Western Casualty & Sur. Co. v. Polar Panel Co.,* 457 F.2d 957 (8th Cir.1972); *Hauenstein v. St. Paul–Mercury Indem. Co.,* 242 Minn. 354, 65 N.W.2d 122 (1954). *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.,* No. 84–CH–11676 (Ill.Cir.Ct.Cook Cty. Aug. 14, 1987) ("*Wilkin*") does not require a contrary result in this case. In *Wilkin,* unlike here, the underlying complaints did not allege property damage and were in fact dismissed on that ground.

**13.** *See Auto–Owners Ins. Co. v. Jensen,* 667 F.2d 714, 720 (8th Cir.1981); *Asbestos Insurance Coverage Cases,* slip op. at 72; *McGroarty,* 329 N.E. 2d at 175, 368 N.Y.S.2d at 490.

**14.** Neither the district court nor the Fourth Circuit opinion in *City of Greenville v. W.R. Grace & Co.,* 827 F.2d 975 (4th Cir.1987) creates a genuine issue of material fact on this issue. The *Greenville* decision does not address the question of whether Grace intended to cause property damage when it sold asbestos-containing building materials, only whether the jury could have properly found that Grace's negligence had risen to a level sufficient to support the award of punitive damages. The *Greenville* jury simply did not find that Grace intended to cause property damage.

Nor are any of the discovery documents placed before the Court by the Carriers sufficient to resist Grace's notion. The statements of Grace personnel contained in those documents concerned their awareness of early public de-

### 2. "During the Policy Period"—Trigger of Coverage

■ The policies' definition of "occurrence" obligates the Carriers to provide coverage for injury or damage taking place "during the policy period." Plaintiffs claimed that their property was damaged from the installation of Grace's products until those products were removed or contained. Thus, the claim settled by Grace was for continuous property damage existing during the policy period of each of the Carriers' policies. Each policy is "triggered" to provide coverage to Grace.

Cases construing trigger-of-coverage language in analagous situations have resulted in a variety of interpretations.[15] Regardless of the labels attached to these various approaches, the task confronting any court is the same—to derive a workable mechanism for identifying injury or damage "during the policy period" in a manner which best comports with the applicable rules of policy interpretation, including the principle that insurance contracts are to be interpreted to fulfill the fundamental purpose of indemnification. Thus, it is not surprising that the different theories articulated by the courts have served in their individual factual frameworks to maximize coverage to the insured. *See Lac D'Amiante Du Quebec, Ltee. v. American Home Assurance Co.*, 613 F.Supp.

1549, 1557 (D.N.J.1985); *appeal docketed*, Nos. 5231, 5249, 5380, 5401 (3d Cir. Apr. 13, 1987) (*"Lac"*); *ACandS, Inc. v. Aetna Casualty and Sur. Co.*, 576 F.Supp. 936, 940 (E.D.Pa.1983), *aff'd in part, rev'd in part*, 764 F.2d 968 (3d Cir.1985) (*"ACandS"*).

Recently, in *Asbestos Insurance Coverage Cases*, a significant coverage case involving asbestos-related bodily injury claims, the court declined to adhere mechanistically to any particular trigger-of-coverage theory. Rather, it chose to interpret the applicable policy language in a manner consistent with the universally accepted rules of policy interpretation. The court concluded that the policies were triggered if they were on the risk at any time that the claimants suffered injury from asbestos through the time of their death or the filing of their claim. This pragmatic approach is the soundest "theory" of all, and the one which this Court will follow.

Plaintiffs' claim, by its very nature, describes property damage resulting in each and every policy period at issue in this case and, thus, requires that each policy be triggered. The Plaintiffs' complaint asserts that Grace's products were defective from the time of installation and that they released, or threatened to release, asbestos fibers into the buildings through a gradual

---

bate over the *possible* long term health effects of exposure to asbestos. None of them even remotely suggests that Grace had concluded that its asbestos-containing building materials actually posed a health hazard or that Grace intended any damage or injury. The discovery documents, like the *Greenville* verdict, do not constitute evidence which creates a genuine issue of material fact regarding Grace's intent.

**15.** One court has held that coverage is provided only by those policies in effect at the time the injury is first manifested. *E.g., Eagle–Picher Indus., Inc. v. Liberty Mutual Insurance Co.*, 682 F.2d 12 (1st Cir.1982), *cert. denied sub nom Froude v. Eagle–Picher Indus., Inc.*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). A second approach, which has been adopted by the Fifth Circuit in applying Louisiana law, triggers coverage throughout the period of exposure to an injury-causing agent. *E.g. Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.), *cert. denied sub nom. Aetna Casualty & Surety Co. v. Porter*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (*"Porter"*); *Ducre v. Executive*

*Officers of Halter Marine, Inc.*, 752 F.2d 976 (5th Cir.1985) (*"Ducre"*). Illinois has adopted yet another approach, which triggers coverage for asbestos-related bodily injury claims as a matter of law at the time of both exposure and manifestation and which will trigger coverage in the intervening period upon a factual showing of injury during that time frame. *Zurich Ins. Co. v. Raymark Indus., Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150, (1987). Further, under the *American Home Prods. Corp. v. Liberty Mutual Ins. Co.*, 748 F.2d 760 (2d Cir. 1984) (*"AHP"*), approach, coverage is triggered only at the time the complained-of injury actually took place.

Finally, *Keene* espoused a "continuous trigger" which triggers all policies in effect between the time of first exposure and the time of manifestation. The continuous trigger is the only trigger ever to have been applied in the context of asbestos-related property damage claims. *Lac D'Amiante Du Quebec, Ltee. v. American Home Assurance Co.*, 613 F.Supp. 1549 (D.N.J., 1985), *appeal docketed*, Nos. 5231, 5249, 5380, 5401 (3d Cir. Apr. 13, 1987).

process of deterioration, as well as through routine maintenance activities and other disturbances. *See* Fourth Amended Complaint, ¶ VIII.[16] Each alleged individual release of asbestos fibers in the Plaintiffs' buildings was part of continuing alleged contamination. *Cf. Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1083 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). Because the alleged contamination was continuous and cumulative, Plaintiffs have set forth a claim of continuous exposure and property damage throughout the policy periods here at issue.[17] *Lac*, the only known decision to address the trigger-of-coverage issue in the context of a claim for asbestos-related property damage, held that asbestos-related property damage was a continuous process which triggered all policies on the risk from the initial installation of asbestos-containing building materials through the removal or containment of those materials.

In *National Standard Insurance Co. v. Continental Insurance Co.*, No. CA–3–81–1015–D (N.D.Tex. Oct. 4, 1983) (Available on LEXIS), the only known decision to address the trigger-of-coverage issue under Texas law, the court applied a continuous trigger and held that all carriers on the risk between the claimants' initial exposure to allegedly toxic chemicals and the manifestation of their diseases were required to defend the policyholder. Similarly, New York courts also have triggered successive policies in effect during a continuous course of injury. *See National Casualty Ins. Co. v. City of Mount Vernon*, 128 A.D.2d 332, 515 N.Y.S.2d 267 (2d Dep't 1987) (where course of wrongful imprisonment continued through two policy periods, both policies were triggered); *McGroarty, supra* (continuous property damage which began prior to policy period but which continued during policy period triggered policy).[18] Moreover, nothing in *AHP* prohibits the triggering of successive policies where injury or damage has taken place in successive policy periods.

Because the Plaintiffs have claimed property damage taking place from the installation of Grace's products in the Plaintiffs' school buildings through the time those products were removed or contained, each policy at issue in this litigation is, therefore, triggered to provide coverage to Grace.[19]

## C. "All Sums"—The Scope of Coverage

■ The policies provide that the Carriers will indemnify Grace for "all sums" which Grace shall be obligated to pay. In the absence of any contrary intent expressed in the policies, this phrase is to be afforded its ordinary meaning, i.e., that Grace will be indemnified for its entire loss. Thus, in the event of a loss, the insurance afforded by the policies will provide full indemnification without requiring Grace to incur an economic detriment beyond the payment of its premium. Each policy must indemnify Grace for the whole of its liability to the Plaintiffs, without any proportion-

---

**16.** In support of Plaintiffs' contentions, representatives of the school districts testified at deposition that asbestos-containing materials present in the school buildings were "eroding," "flaking" and "crumbling" and that this condition grew progressively worse with the passage of time. The representatives also testified that asbestos residue had to be cleaned on a daily or weekly basis and that a routine maintenance program had been initiated to deal with the situation. This Court need not pass upon the accuracy of either the testimony of Plaintiffs' witnesses, the arguments of counsel or descriptions of the mechanism of asbestos-related injury or disease. This information is descriptive of the nature of Plaintiffs' claims with respect to the question of whether those claims come within the coverage afforded by the policies at issue in this case, and is not considered as probative of Grace's purported liability.

**17.** Thus, the Plaintiffs' claim would also satisfy the "exposure theory" articulated by the Fifth Circuit under Louisiana Law in *Porter* and *Ducre* and the "injury-in-fact" theory set forth in *AHP*.

**18.** In *Porter* and *Ducre*, the Fifth Circuit also triggered successive policies in effect during a continuous course of injury.

**19.** As the varying interpretations of the trigger-of-coverage language indicate, the definition of the term "occurrence" is ambiguous and lacks the precision to identify the point in time at which property damage triggers coverage. Therefore, the ambiguity should be resolved in Grace's favor to honor Grace's objectively reasonable expectations when it purchased insurance.

al allocation of liability to Grace for property damage taking place during prior or subsequent periods,[20] subject only to the limits of coverage set forth in each policy.[21] Grace could not have reasonably expected the result to be otherwise. This interpretation is mandated by the plain meaning of the policy language and has been applied in numerous pertinent cases. For example, in *Asbestos Insurance Coverage Cases*, the court recognized that, "the insurers assume liability for damages, not for injuries that cause the damages and trigger the policies," slip op. at 61, and, therefore, held that "policyholders do not have an obligation to share pro rata in indemnification and defense costs." Slip op. at 68.[22]

Because each triggered policy provides coverage for Grace's entire liability, subject to the limits of coverage, Grace may select which of its policies it wishes to provide coverage. In this case, Grace has selected those policies on the risk at or about the time Plaintiffs discovered the asbestos containing products in their buildings, initiated removal or containment operations and brought suit against Grace. Since the indemnification of the settlement and defense costs can be covered by the insurance afforded in a single annual policy period, Grace may designate the policy year that will cover the claim in the Main Action and may recover in this indemnity action from those third-party defendants which sold policies during that period subject, of course, to their policies' limits.[23]

### D. *"Damages"*

 The Plaintiffs' underlying complaint expressly seeks money damages. It does not seek an injunction or any other form of equitable relief. The policies expressly cover Grace's liability to third parties which result in monetary damage awards or settlements, precisely the situation in this case. The sums which Grace is obligated to pay in settlement of the Main Action are not for remedial or abatement activities it has undertaken in compliance with EPA directives.[24] Thus, the money which Grace is obligated to pay under the settlement agreement constitutes "damages" as defined by the policies.

### III.

### EXCLUSIONS

The policies contain certain exclusionary language to which the Carriers have direct-

---

**20.** The Court is not unmindful that *Porter* prorated liability among the carriers. Significantly, in that case, no costs were allocated to the policyholder.

**21.** The policies contain "other insurance" clauses which purport to establish a mechanism to distribute payment between carriers for a single loss. Because these provisions relate only to the rights of each Carrier against the other and because no Carrier has filed a cross-claim in this action, the task of interpreting the "other insurance" clauses is not before the Court. Moreover, the "other insurance" clauses do not establish a basis for allocation to the insured. *See e.g., Transport Ins. Co. v. Lee Way Motor Freight, Inc.,* 487 F.Supp. 1325, 1332 (N.D.Tex. 1980); *American Nurses Assoc. v. Passaic Gen. Hospital,* 98 N.J. 83, 484 A.2d 670 (1984). Therefore, the operation and effect of the "other insurance" clauses cannot be used to transfer any portion of the subject loss to Grace.

**22.** Similarly, in *Keene,* the court found that the plain meaning of the policies obligated each triggered insurance policy to provide coverage in full without any allocation to Keene Corp. The court held that this result reflected the objectively reasonable expectations of Keene Corp. that its protection against liability for latent injuries would not be undermined by prior periods in which it had no insurance. 667 F.2d at 1047–48. *Lac* fully embraced this aspect of *Keene,* 613 F.Supp. at 1562–63.

**23.** The Court agrees with the argument of those Carriers who sold Grace policies of excess insurance that they are not obligated to indemnify Grace until the limits of the underlying insurance have been exhausted. However, once the limits immediately underlying a given excess policy are exhausted, Grace may call upon that excess policy to provide coverage. Grace, however, is not obligated to first exhaust all underlying insurance in every policy period before it can proceed to obtain indemnification from its excess carriers. The requirement of exhaustion applies only to those policies which share the same policy period.

**24.** Even in cases involving coverage for cleanup costs incurred by a policyholder in complying with governmental directives in environmental matters, the weight of authority and better reasoned decisions hold that those costs are "damages." *See e.g., Township of Gloucester v. Maryland Casualty Co.,* 668 F.Supp. 394 (D.N.J.1987); *New Castle County v. Hartford Accident Co.,* 673 F.Supp. 1359 (D.Del.1987), *reported in* 1987 Litigation Rep.—Ins., Nov. 10, 1987 (Mealey's).

ed the Court's attention. None of these exclusions, however, bars coverage for Plaintiffs' claims or raises issues of fact which would preclude summary judgment.

### 1. The "Own Product" Exclusion

■ The policies contain a specific exclusionary clause relating to coverage for the Insured's own products and work. The clause purports to exclude coverage for claims:

(i) on account of Personal Injuries or Property Damage resulting from the failure of the Assured's products or work completed by or for the Assured *to perform the function or serve the purpose intended by the Assured*, if such failure is due to a mistake or deficiency in any design, formula, plan, specification, advertising material or printed instructions prepared or developed by the Assured; but this exclusion (1) does not apply to Personal Injuries or Property Damage resulting from the active malfunctioning of such products or work;

(ii) On account of Property Damage to the Assured's products arising out of such products or any part of such products;

(Emphasis added).

The first paragraph of this clause, by its terms, does not apply to Plaintiffs' claims. The Plaintiffs did not claim that the asbestos-containing products failed to perform the function or to serve the purpose for which they were purchased, i.e., fireproofing or acoustical insulation. *See International Hormones, Inc. v. Safeco Ins. Co. of Am.*, 57 A.D.2d 857, 394 N.Y.S.2d 260 (2d Dep't 1977) (*"International Hormones"*).

Nor does the second paragraph apply. Plaintiffs did not seek recovery for damage to Grace's own property or products. Rather, as discussed above, Plaintiffs sought money damages to compensate them for injury to the school buildings and their contents. Under both New York and Texas law, the "own product" exclusion does not apply to bar coverage of third-party claims for damage to property into which the policyholder's property or product has been incorporated. *International*

*Hormones*, 394 N.Y.S.2d at 261; *Travelers Ins. Co. v. Volentine*, 578 S.W.2d 501, 504 (Tex.Civ.App.—Texarkana 1979, no writ). *See also Goodyear Rubber & Supply Co. v. Great American Ins. Co.*, 471 F.2d 1343 (9th Cir.1973).

Thus, the "own product" exclusion does not bar coverage for the damages alleged to have been sustained by the Plaintiffs' buildings or their contents, or for the cost of removal, containment and replacement activities undertaken by Plaintiffs to remedy those damages.

### 2. The "Product Withdrawal" Exclusion

■ The policies contain a product withdrawal or "sistership" exclusion which purports to exclude coverage for:

replacement, or loss of use of the Assured's products or work completed by or for the Assured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

This provision operates to exclude coverage for the cost of "preventative or curative action" when the insured withdraws a product in situations in which a danger is merely apprehended. *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 419 (5th Cir.1982). It does not, however, operate to exclude coverage for actual damage caused by the very product giving rise to such an apprehension. *Id.*

Grace did not withdraw its products from the Plaintiffs' buildings. Where, as here, a policyholder's products have been withdrawn by a third-party claimant, the "sistership exclusion" does not apply. *Elco Indus., Inc. v. Liberty Mutual Ins. Co.*, 90 Ill.App.3d 1106, 46 Ill.Dec. 319, 414 N.E.2d 41 (1980). *See also Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 314 N.E.2d 37, 357 N.Y.S.2d 705 (1974); *Parker Prods., Inc. v. Gulf Ins. Co.*, 486 S.W.2d 610 (Tex.Civ.App.—Fort Worth 1972), *aff'd*, 498 S.W.2d 676 (Tex.1973). Further, according to Plaintiffs' claims, the withdrawal of Grace's products was not merely a "preventative" measure because

damage had already taken place when the products were withdrawn. The sistership exclusion does not apply.

## IV.

### OTHER DEFENSES

#### A. *Notice*

■ The policies provide that:

Whenever the Assured has information from which the Assured can reasonably conclude that an occurrence ... involves injury or damages which [are] likely to involve this policy, notice shall be sent [to Marsh & McLennan, Inc.] provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy ... shall not prejudice such claims.

Grace fully complied with this provision. It is uncontroverted that Grace first became aware that its products were present in the Plaintiffs' school buildings when it was served with the Summons and Complaint in the Main Action. It also is uncontroverted that, upon receipt of the Summons and Complaint, Grace immediately notified Marsh & McLennan, Inc., the insurance broker involved in the placement of the policies. Before being apprised of the facts and circumstances pertinent to Plaintiffs' claims, Grace had no way of knowing whether an "occurrence" which was likely to involve the policies had taken place.[25]

#### B. *Misrepresentation*

■ At the time Grace responded to the application for insurance, health concerns relating to asbestos generally were discussed in the public domain. Nevertheless, the application for insurance did not contain a single question relating to asbestos-containing building products. Rather, after numerous specific questions, the application contained a final, vague and open-ended question which read: "additional in-

formation, if any." Grace's response, that it "knew of no other relevant facts," does not rise to the level of a misrepresentation or omission which would void coverage.

An insured generally is under no duty to provide information on an application for insurance as to which the insurance company has made no specific inquiry, unless those facts are "unusually threatening and not open to general observation." *American Cent. Ins. Co. v. Nunn*, 79 S.W. 88 (Tex.Civ.App.), *rev'd on other grounds*, 98 Tex. 191, 82 S.W. 497 (Tex.1904); *see also Barker v. Travelers Ins. Co.*, 52 S.W.2d 285 (Tex.Civ.App.—Amarillo 1932), writ dismissed. 125 Tex. 359, 80 S.W.2d 953 (1935); 45 Tex.Jur.3d, *Insurance Contracts and Coverage* § 263 at p. 489; 7 *Couch on Insurance* 2d (rev'd ed.) § 35–143, pp. 243–47 (1985). Grace was under no duty to disclose its awareness of the public debate concerning asbestos.

The Carriers bear the burden of proving that the policies at issue in this litigation were void *ab initio* if Grace engaged in misrepresentations or failed to disclose material facts in its application for insurance. *See Carter v. Service Life & Casualty Ins. Co.*, 703 S.W.2d 349 (Tex.App.—Corpus Christi 1985, no writ). To sustain this burden, the Carriers must prove:

(1) that a misrepresentation was made;

(2) that it was false;

(3) that the insurer relied upon the misrepresentation in issuing the policy; and

(4) that the misrepresentation was made willfully with the intent to deceive or to induce the insurance company to issue the policy.

*Lee v. National Life Assurance Co.*, 632 F.2d 524 (5th Cir.1980); *Diggs v. Enterprise Life Ins. Co.*, 646 S.W.2d 573 (Tex.

---

25. At oral argument, counsel for third-party defendant Guarantee argued that Guarantee had not received notice of any asbestos claims against Grace until its receipt of Grace's Summons and Complaint in May of 1987. The Guarantee policies "followed form" to the so-called "umbrella" liability policies issued by London, and incorporate by reference the no-

tice provisions set forth in the London policies. As noted above, Grace complied with this provision by sending timely notice to Marsh & McLennan, Inc. The policies did not require Grace to send notice to its carriers directly. Grace should not be denied insurance coverage as a result of a third-party's apparent failure to forward notice to Guarantee.

App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.). The Carriers have failed even to establish the existence of a genuine issue of material fact regarding key criteria of this standard.[26] They certainly have not carried their burden. In the absence of any showing of misrepresentation by Grace, the policies are not void.

### C. *The Carriers have Waived the Defenses of Late Notice and Misrepresentation*

■■ In any event, the Carriers have waived their rights to deny coverage to Grace on the grounds of late notice and misrepresentation. The record demonstrates that, as early as 1978, Grace notified its Carriers of the existence of claims against Grace which alleged that exposure to Grace's asbestos-containing products was hazardous. In 1982, Grace notified its carriers of claims brought by school districts alleging asbestos-related property damage. In February of 1984, Grace called a meeting of all of its carriers to discuss the issue of asbestos-related property damage. In April of 1984, Grace notified its carriers of the pendency of the Main Action. In 1986, both through Grace and the public record, the carriers learned of the verdict against Grace in the *Greenville* litigation. In April of 1987, Grace again called a meeting of its carriers to discuss asbestos-related property damage claims in general and the Main Action in particular.

Until the summer of 1987, after this coverage action was commenced, the Carriers did not raise the grounds of late notice and misrepresentation. Moreover, during this entire period, the Carriers continued to sell insurance to Grace and to maintain those policies, despite the fact that the policies enabled the Carriers to terminate coverage on sixty-days notice. Grace continued to

purchase insurance, believing that its policies would remain in effect when called on to provide coverage. Finally, as demonstrated by the Carriers' positions in this action, and their steadfast refusal to provide coverage to Grace for numerous other asbestos-related property damage claims, any request by Grace for coverage of the Plaintiffs' claims at an earlier date would have been a mere exercise in futility.

Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming such a right. *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396 (Tex.1967). By knowing of facts which would permit them to assert these defenses, by remaining silent and by continuing to sell insurance to Grace, the Carriers waived their defenses of late notice and misrepresentation. *See American Employers' Ins. Co. v. Brock*, 215 S.W.2d 370 (Tex.Civ.App.—Dallas 1948, *writ ref'd* n.r.e.).

### CONCLUSION

For the foregoing reasons, Grace's motion for summary judgment is hereby granted in full. Consistent with this opinion, the Court shall herewith enter under seal the annexed Order entering summary judgment on Grace's behalf.

---

26. For example, despite the Carriers' numerous evidentiary submissions to this Court, by affidavit and otherwise, there is no evidence that the Carriers relied upon the purported misrepresentations or that Grace intended to deceive the Carriers. At oral argument, counsel for the Carriers stated, "we *believe* that Grace *may* have omitted material facts in applying to our companies for these policies." (Tr. at 52, emphasis added). Such speculative and unsupported assertions are insufficient to resist a motion for summary judgment.