[No. 24105-2-I.  Division One.  April 16, 1990.]

OLYMPIC STEAMSHIP COMPANY, INC., *Respondent*, v.
CENTENNIAL INSURANCE COMPANY, ET AL,
*Appellants.*

*Barry N. Mesher, Linda E. Blohm, Robert Israel,* and *Lane Powell Moss & Miller,* for appellants.

*Eric Richter* and *Skeel, Henke, Evenson & Roberts,* for respondent.

FORREST, J.—Centennial Insurance Company and Atlantic Mutual Insurance Company (Centennial) appeal from the grant of summary judgment finding coverage in favor of Olympic Steamship Company, Inc. (Olympic) and from the award of attorney fees to Olympic. We reverse and remand for the entry of summary judgment in favor of Centennial.

Olympic was a commercial warehouseman of canned salmon, whose business was to receive unlabeled cans from commercial salmon packers, to store the cans until the

packers released the cans, and then to label, package in cartons, and ship the cans pursuant to the packers' instructions. On May 6, 1985, Olympic discovered that an automatic casing machine manufactured by Salwasser Manufacturing was damaging .015 percent of the cans as they were being loaded into cartons. This damage had been occurring since the installation of the machine on December 6, 1984. Olympic notified the National Food Processors Association (NFPA), which in turn notified the Food and Drug Administration (FDA). The FDA issued a "recall fact sheet", which announced that NFPA, through Olympic, would carry out a physical examination of the cans. Olympic and the packers agreed that the packers would conduct physical examinations of the cans at their destinations, rather than shipping the cans back to Olympic. The packers then made demands on Olympic for their expenses incurred in the examination process.

In June 1985, Olympic made demand on Centennial and Atlantic Mutual. They did not respond, and Olympic paid the claims made by the packers. Olympic, through its insurance agent, asked Centennial to delete the completed operations exclusion from Olympic's policy, effective at the effective date of the policy, September 19, 1984. On May 12, 1986, Centennial issued endorsement 12, which deleted the completed operations exclusion effective December 31, 1984. Centennial later backdated the policy to make the deletion effective at the effective date of the policy.[1]

On September 16, 1987, Olympic brought an action against Centennial, seeking recovery of the packers' "loss of use and marketability of all of the uninjured cans in their warehouses, which occurred after May 6, 1985, by reason of their obligation to verify the safety of their product or not

---

[1]Centennial and Olympic have expended considerable time and effort disputing the validity and effective dates of the removal of the "products" and "completed operations" exclusions. For the purposes of this opinion, we presume in favor of the insured and conclude that the exclusions were removed effective September 19, 1984, pursuant to policy change 17.

sell it", which were paid by Olympic.[2] Cross motions for summary judgment were filed, and the court ruled in favor of Olympic, finding that the policy provided coverage. Centennial's motion for reconsideration was denied. The court also awarded Olympic its attorney fees incurred in settling the packers' claims, in settling a claim against Salwasser Manufacturing, and in obtaining the coverage judgment. Centennial appeals from all aspects of the judgment.

## SISTERSHIP EXCLUSION

The material part of exclusion O, the sistership exclusion, reads as follows:

> [This insurance does not apply] to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the *named insured's products* or work completed by or for the *named insured* or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

The trial court found that the exclusion was inapplicable on the grounds that the FDA, rather than the insured, had ordered the withdrawal of the cans from the market until the inspection was complete. We disagree. On discovering the defect, Olympic recognized its responsibility by notifying NFPA. This action culminated in the FDA order prohibiting distribution until inspection ensured the safety of the product. It is the relationship between the defect (cases containing damaged cans) and the nature of the damage (inspection costs) that determines the applicability of exclusion O, not whether FDA issued an order or whether

---

[2]Olympic expends considerable effort in arguing that it seeks coverage for the packers' "loss of use and marketability" of the undamaged cans, not the packers' inspection costs. However, Olympic's complaint, attached as appendix A to Centennial's brief, states that Olympic "settled the claims for payment of the costs incurred by its customers in uncasing, inspecting, and recasing their cans" and that Olympic seeks coverage for those costs. While the complaint mentions that the packers were unable to market the undamaged cans until they were inspected, the complaint does not allege that the packers made any claims against Olympic for the losses incurred by this inability to market. Regardless of the name ascribed to the losses, the claims settled by Olympic and sought against Centennial are the inspection costs.

the packers voluntarily held the product in their warehouse. Nothing in the language of the exclusion suggests that coverage depends on the source of the withdrawal decision. We deem it irrelevant. As stated in *Yakima Cement Prods. Co. v. Great Am. Ins. Co.*:[3]

> The rationale behind the sistership exclusion has been explained as follows:
>> The recall of equipment or parts discovered to have a common fault involve expenses incurred to prevent accidents which have not occurred. While the insurance covers damages for bodily injuries and property damage caused by the product that failed, it was never intended that the insurer would be saddled with the cost of preventing other failures, any more than it was intended that the insurer would pay the cost of preventing the first failure if the product had been discovered to be in a dangerous condition before the occurrence.
>
> 3 R. Long, *Law of Liability Insurance,* § 15, App. at 47 (1966).
> Thus, the insurer is not liable for the cost of preventative or curative action taken by its insured. Instead, the insured must bear the cost of withdrawing a product from the market in situations in which a danger is apprehended although no accident has occurred. *Wyoming Sawmills, Inc. v. Transportation Ins. Co.,* 282 Ore. 401, 578 P.2d 1253 (1978).

Olympic argues that sistership exclusions have been held inapplicable when a third party requires the withdrawal of the product from the market. *Elco Indus., Inc. v. Liberty Mut. Ins. Co.;*[4] *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*[5] These cases are inapplicable. In *Elco Industries,* an engine manufacturer incorporated components manufactured by the insured into its engines. These components were found to be faulty, and the engine manufacturer recalled the engines and replaced the component. The insurer argued that the sistership exclusion applied. The court rejected the full application of the exclusion on a number of grounds, one of which was that the insured had

---

[3]22 Wn. App. 536, 541–42, 590 P.2d 371 (1979), *rev'd on other grounds,* 93 Wn.2d 210, 608 P.2d 254 (1980).

[4]90 Ill. App. 3d 1106, 414 N.E.2d 41, 45 (1980).

[5]34 N.Y.2d 356, 314 N.E.2d 37, 38–39, 357 N.Y.S.2d 705 (1974).

not recalled the components. However, even in rejecting complete application of the exclusion, the court limited coverage as follows:

> We believe the policy provides coverage for the costs of the paper gaskets and welsh plugs which were destroyed and replaced in the process of removal and repair. It would also encompass such labor expenses as might be attributable to the disassembly, reassembly, removal or replacement of parts of Kohler's engines *other than the Elco pins,* which was necessitated by correction of the pins. *No recovery may be had for the value of the defective pins, or the cost of the new case hardened pins or caps placed upon the unhardened pins. . . .* We therefore remand the cause for a factual determination of the costs of materials and labor involving the removal and replacement process, *excluding the costs of replacing the defective governor regulating pins themselves.*

(Citations omitted. Italics ours.) *Elco Industries,* at 1112–13. The damages for which Olympic seeks coverage are not damages to other property caused by the defective product; they are the costs of remedying the defect in the product. The *Elco Industries* case is not persuasive.

In *Lipton,* the soup company purchased noodles from the insured, Giola, which were incorporated into its products. When the noodles were discovered to be contaminated, Lipton withdrew its products from the market and then brought an action against Giola. The court rejected application of the sistership exclusion on the grounds that Giola did not recall the product. We do not find this case persuasive. Of the six categories of loss claimed by Lipton against Giola, five involved consequential damage to Lipton's products caused by the contaminated noodles. Only one involved the losses incurred in destroying the noodles that had not yet been incorporated into Lipton's products. We do not believe that this was a significant part of Lipton's damages, and therefore the court did not analyze the difference between the destruction of Giola's product and the plainly consequential damages. The case is further distinguished by the fact that Lipton took all the necessary action at its own expense before suing Giola and its insurer. In our case the value of the damaged cans (the equivalent

of the noodles) is de minimis and no claim is asserted in regard thereto. To the extent that *Lipton* may hold that exclusion O does not apply to defects in the insured's products while still in the same condition as when they left the insured's control, we decline to follow it.

The federal cases cited by Olympic are similarly inapplicable. In *Todd Shipyards Corp. v. Turbine Servs., Inc.,*[6] the court rejected application of the sistership exclusion because the damages claimed were the damages to a turbine caused by a defective component installed by the insured, not damages to the insured's product. In *American Home Assur. Co. v. Libbey–Owens–Ford Co.,*[7] the court did not definitively decide whether the sistership exclusion should apply because it affirmed the District Court's assumption that the claimed damages were consequential to the failure of the insured's products and were not damages to the products themselves. In *Dayton Indep. Sch. Dist. v. National Gypsum Co.,*[8] the court held that the sistership exclusion did not apply because the insured had not recalled its product. However, the damages being claimed against the insured were not for damages to the insured's product—in that case, building materials containing asbestos—but rather were for the consequential damages to the buildings that contained the building materials.

Finally, Olympic relies upon the *Yakima Cement* case, arguing that the claimed damages are not the result of preventative or curative action that it initiated, but rather are the result of the FDA's action. It relies on the following language:

> The sistership exclusion has no application to the facts in this case.
> That provision applies only if the product or property of which it is a part is "withdrawn from the market or from

---

[6]674 F.2d 401, 419 (5th Cir.), *cert. denied,* 459 U.S. 1036 (1982).

[7]786 F.2d 22, 29 (1st Cir. 1986).

[8]682 F. Supp. 1403, 1412–13 (E.D. Tex. 1988).

use" by the insured, and even in such situations, the policy still covers damages caused by the product that failed.

*Yakima Cement,* 22 Wn. App. at 544 (quoting *Arcos Corp. v. American Mut. Liab. Ins. Co.,* 350 F. Supp. 380, 385 (E.D. Pa. 1972).

However, this case is also inapplicable to Olympic's claims. The language upon which it relies is dicta in *Yakima Cement,* as it was in *Arcos Corp.* As in the previous cases, Yakima Cement did not seek coverage of the damages to its own product, concrete panels, which it repaired at its own expense. It did seek coverage of the consequential damages of construction delays and damage to other building materials that resulted from the defective panels. The court held that the sistership exclusion did not apply to those consequential damages. It does not address or control the applicability of the sistership exclusion to damages to the insured's product, and we decline to follow any language that suggests that it does.

If the defect had been discovered while the cases were still in Olympic's possession, exclusion O would indisputably apply. Moving the cases from Olympic's warehouse to the packers' warehouse does not alter the nexus between Olympic's activities which caused the defect and the damage. The cases were not further processed or incorporated in another product. No additional harm was caused beyond that inherent in the product when it left Olympic's control. Concededly, the inspection could have been done at Olympic's premises, or by Olympic's personnel at the packers' premises, or as it was finally agreed upon, by the packers' personnel at the packers' premises. The choice was taken to minimize expense, and does not determine coverage. The inspection at the packers' premises remedied Olympic's error in exactly the same way as inspection at Olympic's premise would have. Under these circumstances, Olympic designated the packers as its agents for inspection. We hold that exclusion O applies to the inspection costs at issue.

## DEFINITION OF "PRODUCT"

Olympic places great stress on its assertion that the cans are not "named insured's product" because it never "manufactured, sold, handled or distributed" the cans.[9] It asserts that the term "handle" is limited to the meaning of "to buy and sell; to deal, or trade in."[10] It also asserts that it only provided services for the packers, and that providing services does not make the cans "named insured's product".

Centennial asserts that the cases of cans fall within the definition of "named insured's products" because that definition has been held to include "goods which are processed or assembled in the ordinary channels of commerce" in *Prosser Comm'n Co. v. Guaranty Ins. Co.*[11] It contends that Olympic's operations include handling, processing and assembling the cans into the cases, and therefore the cases are "named insured's product" of Olympic.

In view of the policy language, we do not see any significance to the distinction between product and services on the facts before us. The exclusion says, "*named insured's products* or *work* completed by . . . the named insured or of any property of which such products or *work* form a part." (Some italics ours.) Even if the cases do not constitute Olympic's "product", Olympic's activities are encompassed in the term "work". No case was cited holding that activities such as those performed by Olympic do not constitute "work" within the terms of exclusion O. In any event, we hold that the cases of canned salmon are Olympic's "named insured's product" because of the labeling and packing operations that Olympic performed on the cans. It was the possibility of a defective can in such cases that rendered each case "defective" until inspected.

---

[9]"Named insured's products" are defined in the policy as "goods or products manufactured, sold, handled or distributed by the *named insured, . . .*."

[10]*Todd Shipyards Corp. v. Turbine Servs., Inc.*, 674 F.2d at 419–20; *Smedley Co. v. Employers Mut. Liab. Ins. Co.*, 143 Conn. 510, 123 A.2d 755, 758 (1956).

[11]41 Wn. App. 425, 431, 700 P.2d 1188, *review denied*, 104 Wn.2d 1016 (1985).

The cases cited by Olympic for its contention that it did not "handle" the cans are inapplicable. In those cases, the only action of the insured was the physical handling and transport of the property. However, the labeling and packaging operations performed by Olympic fall within the definition in *Prosser Commission Co.* Further, in *Westman Indus. Co. v. Hartford Ins. Group,*[12] this court rejected the argument that the definition of "product" does not apply when the insured performs services as part of its operations.

## CONCLUSION

Given our determination that the sistership exclusion should have been applied, we decline to resolve the other issues raised by Centennial regarding whether there had been an "occurrence" resulting in "property damage" under the policy, and whether the "products exclusion" and the "completed operations exclusion" of the policy should have been applied. This case comes to us on cross motions for summary judgment. There are no issues of material fact. Accordingly, we grant summary judgment in favor of Centennial. The trial court's award of attorney fees to Olympic was predicated on its determination of coverage, and accordingly we reverse that award and deny Olympic's request for attorney fees on appeal.

GROSSE, A.C.J., and BAKER, J., concur.

Review granted at 115 Wn.2d 1001 (1990).

---

[12] 51 Wn. App. 72, 76, 751 P.2d 1242, *review denied,* 110 Wn.2d 1036 (1988).