FEDERATED MUTUAL INSURANCE COMPANY and Grain Dealers Mutual Insurance Company, Plaintiffs,

v.

BOTKIN GRAIN COMPANY, Defendant.

Civ. A. No. 91–1223–MLB.

United States District Court,
D. Kansas.

June 16, 1994.

Timothy J. Finnerty, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, for

plaintiff Federated Mut. Ins. Co., a MN Corp.

Lee H. Woodard, Michael M. Walker, Woodard, Blaylock, Hernandez, Roth & Day, Timothy J. Finnerty, McDonald, Tinker, Skaer, Quinn & Herrington, Lynn D. Preheim, Morrison & Hecker, Wichita, KS, for plaintiff Grain Dealers Mut. Ins. Co.

Charles E. Millsap, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for defendant Botkin Grain Co., a KS Corp.

## MEMORANDUM AND ORDER

BELOT, District Judge.

Botkin Grain Company, Inc. (Botkin Grain) has filed a motion to alter or amend the judgment entered on February 8, 1994 (Doc. 80) in favor of plaintiff insurance companies in this case, 844 F.Supp. 673. Both insurance companies have responded (Docs. 83 and 88). Botkin Grain has not filed a reply. However, some three months after filing its original motion, Botkin Grain has requested permission to supplement its earlier motion to present briefs filed by plaintiff Federated Mutual Insurance Company (Federated) in other cases which Botkin Grain contends assert positions diametrically opposed to the positions Federated has asserted in this case (Doc. 89). Federated has responded in opposition to this motion (Doc. 91).

■ Fed.R.Civ.P. 59(e) was adopted to clarify that the district court possesses the power to correct its own mistakes in the period immediately following entry of the judgment. *White v. New Hampshire Department of Employment Security*, 455 U.S. 445, 450, 102 S.Ct. 1162, 1165, 71 L.Ed.2d 325 (1982). Rule 59(e) is properly invoked to support reconsideration of matters properly encompassed in a decision on the merits. *Id.* at 451, 102 S.Ct. at 1166. A Rule 59(e) motion allows a party to allege fundamental legal errors which require the court to reconsider an earlier decision. A Rule 59(e) motion is directed at reconsideration, not initial consideration. *Buell v. Security General Life Insurance Co.*, 784 F.Supp. 1533, 1535 (D.Colo.1992), aff'd in part, rev'd in part on other grounds, 987 F.2d 1467 (10th Cir.1993). A party cannot invoke Rule 59(e) to raise arguments or evidence that could and should have been presented in the first instance. 784 F.Supp. at 1536.

Botkin Grain requests the court to alter and set aside its order for the following reasons:

1. The court failed to view the evidence in a light most favorable to Botkin Grain, or to give Botkin Grain the benefit of all reasonable inferences which can be drawn from that evidence;

2. The court erroneously placed the burden of proof on Botkin Grain in examining the application of the pollution exclusion and Federated's clarification of that exclusion;

3. The court went beyond the scope of Federated's summary judgment motion in finding as a matter of uncontroverted fact that no leakage of petroleum products occurred from the tanks or underground piping; and

4. The court failed to address the separate issue of the insurance companies' duties to defend Botkin Grain.

Each of these grounds will be discussed separately.

### The Court's Consideration of the Evidence

■ Botkin Grain contends that in ruling favorably upon the insurance companies' motions for summary judgment, the court failed to view the evidence in the light most favorable to Botkin Grain. Botkin Grain says that:

The Court in effect has found it to be an uncontroverted matter of fact that petroleum products never leaked from the tanks and piping at the Argonia fuel depot. Such a finding was made in spite of the following:

1. There are no other possible sources for groundwater contamination.

2. Mobil Oil Corporation, which sold the depot to Botkin Grain in 1978, was suffering from unexplained shortages in its inventory just prior to the sale.

3. When tank No. 5 was lifted from the ground after Botkin Grain decided to close the fuel depot, it was discovered that the

ground was discolored at that spot, indicating probable leakage from that tank.

4. The Court found that there were no surface spills which caused the groundwater contamination, leaving as the only possible source of pollution leaking of tanks or lines.

5. Botkin Grain's petroleum product inventory records, during the time it operated the fuel depot, showed shortages.

The court's findings of uncontroverted facts regarding the fuel depot are listed on pages 2 and 3 of its memorandum and order (Doc. 80). Botkin Grain has not specifically challenged the accuracy of any of the facts recited by the court. Nor has Botkin Grain deigned to favor the court with citations to the record supporting the facts which it now claims the court overlooked. Despite this failure, the court will consider each of the claimed deficiencies.

In Fact No. 1, Botkin Grain contends that there are no possible sources for the underground contamination other than leaks in the tanks or piping. This is not strictly so because, as the court previously noted, the KDHE inspector expressed his opinion that it was "possible" that an accumulation of several small surface spills, presumably when trucks were being loaded or during some similar event, could have caused the contamination. Be that as it may, the factual issues raised in the parties' cross-motions focused more narrowly than just all possible causes of the contamination.

The pollution exclusion which was present in all the policies issued by both insurance companies expressly excluded liability for property damage caused by the discharge of liquids into or upon lands *except* when the discharge was "sudden and accidental." Botkin Grain sought summary judgment that the exclusion did not apply (Doc. 54, p. 87) and, of course, the insurance companies sought summary judgment that the exclusion did apply. Thus, the issue was not merely whether the source of the contamination was a discharge from tanks or piping; rather, in

order for there to be coverage, any discharge had to be "sudden and accidental."[1] The court's ultimate finding was that there was no evidence of a "sudden and accidental" discharge. This finding remains unchallenged.

In Fact No. 2, Botkin Grain avers that Mobil Oil was suffering from unexplained inventory shortages "just prior to the sale in 1978." In its order, the court noted that inventories taken during the period when Mobil Oil owned the depot were always short, but it cannot now locate any evidence that these shortages were "just prior to the sale." Moreover, assuming such evidence exists, the court is left to speculate why Botkin Grain believes evidence of shortages "just prior to the sale" is material.

In Fact No. 3, Botkin Grain contends that when tank No. 5 was lifted from the ground[2] (apparently some time after the depot was closed in 1989), discoloration was discovered "indicating probable leakage from that tank." The only evidence regarding tank No. 5 is in the deposition of Archie Watts, who worked at the depot when it was operated by Mobil Oil *prior to 1978.* Watts testified:

Q: I want to make sure I'm clear on when these bottoms were replaced.

A: Okay.

Q: Were they replaced before the tanks were ever installed?

A: Well they were—they brought them in here before they filled them, they put the new bottoms in. But they were used tanks. Now, if Mobil owned them someplace else, I couldn't tell you, or if they bought them.

A: Okay.

A: But they had product in them, but they had been pumped out. But as far as the product that I had anything to do with, there was nothing put in them until the new bottoms were put in.

Q: Okay. Do you know why the old bottoms were replaced?

---

1. See, however, the discussion regarding the Federated "clarification," *infra.*

2. Tank No. 5, as well as the other tanks, were of the above-ground variety. There were no underground tanks. There was underground piping.

A: The only thing I can figure is that they figured, well, we're going to start out with a new man, new bulk plant, we'll just put new bottoms in while we can. Now, probably they put some in the older tanks if they had been empty at that particular time or something like that. But they never was empty completely.

Q: Do you know of any leaks directly out of the tank themselves?

A: None whatsoever that I recall.

Q: Do you have any idea where this product could have come from?

A: Which product now are you talking about?

Q: The product that was found in the groundwater around the depot.

A: I have no idea.

Q: Have you—I mean do you have a speculation[3] about whether it came out of the pipes or out of the tanks or out of the spills from overflows or—.

A: Well, the only thing I can tell you, I think that No. 5 was the one they found some holes in. I didn't know that until they had already found them.

Q: Who told you that there were holes in No. 5?

A: Well, I think when we was looking at them or something, wasn't it, John? Wasn't No. 5 the one that was leaking on the sand?

Mr. Botkin: No. 5 showed a little discoloration underneath the tank on the sand.

A: But—

Q: And that held diesel fuel?

A: Unleaded gas.

Mr. Botkin, who operated the depot *after 1978*, testified:

Q: Okay do you have any evidence of when the fuel or the petroleum products got into the groundwater?

A: No.

Q: When you were operating the fuel depot, did you have any procedure in place to monitor possible spills or leaks?

A: No.

Q: Do you know if there were—if you experienced any spills or leaks while you were operating the fuel depot?

A: No not that I know of.

Q: Could the groundwater contamination have come from the operation when it was in Mobil's hands?

A: Yes.[4]

Mr. Botkin also testified that after the depot was closed in 1989, he tried, unsuccessfully, to have the pipes tested for leakage and to have the petroleum found in the groundwater tested for "age." Mr. Botkin stated that prior to August 1986, he kept no records which would show fuel discrepancies in the tanks and that while he kept records after August 1986 which showed "very little" discrepancies, he attributed them to such things as incorrect measurement of the amount of fuel in the tanks.

This testimony, viewed in the light most favorable to Botkin Grain, shows that holes of unstated size, number and age apparently were discovered in the bottom of tank No. 5 after the depot was closed in 1989. The court will assume that Mr. Botkin either did or would testify that he observed "a little discoloration underneath the tank on the sand." This may be either direct evidence of some leakage or it may support an inference of leakage but it does not establish when the tank leaked nor is it persuasive evidence of a "sudden and accidental" discharge in view of

---

3. The court is not inclined to recognize an inference based upon speculation.

4. None of the policies were in effect during the time Mobil operated the depot. In case No. 92–1650, pending in this court, Botkin Grain has sued Mobil Oil contending, in substance, that the groundwater contamination was caused by leaks which occurred prior to the time Botkin Grain took over operation of the depot and that Mobil concealed the leaks from Botkin Grain. To the extent that any language in the court's earlier order may be construed as a finding that the contamination could not have been caused by some event which occurred during the period when Mobil operated the depot, that language is withdrawn. The court's rulings in this case concern only issues pertaining to insurance coverage.

the other evidence which demonstrates that Mr. Botkin was not aware of any spills or leaks and either had no means to detect leaks or discrepancies, or when he did have means to detect discrepancies after August 1986, they were small and did not indicate to him that his tanks or lines were leaking.

In Fact No. 4, Botkin Grain states that the court's finding that there were no surface spills which caused the groundwater contamination leaves "... the only other possible source of pollution leaking of tanks or lines." This claim is essentially the same as Fact No. 1 and the court's observations about the previous "facts" apply here. Botkin Grain does not contest the court's finding that Botkin Grain has no idea how or when the contamination occurred and that the KDHE, which investigated the contamination, has taken no position regarding how or when the contamination occurred. In view of this evidence, it would not be reasonable to infer that the tanks or lines "suddenly and accidentally" leaked.

Finally, in Fact No. 5, Botkin Grain states that its product inventory records showed shortages. The court noted this in its order. However, Mr. Botkin did not think the discrepancies were particularly significant. The testimony of the KDHE investigator that he did not place much credence in inventory discrepancies as evidence of leakage is not challenged. Under these circumstances, the court is hard pressed to find any materiality in the testimony regarding discrepancies insofar as it would give rise to evidence of, or even an inference of, a "sudden and accidental" discharge.

In summary, the court is satisfied that it correctly stated the undisputed facts pertinent to the issues raised in the parties' cross-motions for summary judgment and that it gave Botkin Grain whatever favorable interpretation or inferences could arise from those facts.

### Allocation of the Burden of Proof

Botkin Grain contends that the court erroneously allocated the burden of proof and relieved the insurance companies of their obligation to prove facts necessary to invoke the exclusions in their policies. On page 5 of its order, the court stated:

> Botkin Grain has the initial burden to prove a loss (contamination causing property damage) covered by the policy. The court will assume, for purposes of the motions, that Botkin Grain has done so by evidence of the discovery of fuel in the adjoining landowner's water well. The burden then shifts to the insurance companies to prove facts showing that loss arose out of a discharge, dispersal, release or escape of fuel which was *not* sudden and accidental. *United States Fidelity & Guaranty Company v. Morrison Grain Co.*, 734 F.Supp. 437, 443 (D.Kan.1990).

Although the court will agree that it could have been somewhat more precise, it nevertheless believes it properly allocated the burden of proof on the exclusion issue. As noted in the order and again herein, the policies excluded pollution coverage *unless* the discharge was "sudden and accidental." Because neither insurance company really contested that the groundwater contamination was the result of pollution,[5] the court focused on and ultimately found that based on the undisputed facts, a "sudden and accidental" discharge of fuel never occurred at the depot during the time the insurance companies were on the risk. Thus, the court found that the insurance companies had met their burden of proof with respect to the applicability of the pollution exclusion. The court did not, as Botkin Grain claims, require Botkin Grain to prove that a "sudden and accidental" discharge occurred; it squarely and unequivocally placed the burden on the insurance companies to prove that a "sudden and accidental" discharge did *not* occur. While Botkin Grain apparently remains unconvinced, it still has not pointed to any evidence which would create a dispute of material fact regarding the critical requirement of a "sudden and accidental" discharge. The mere existence of contamination, standing alone, is not evidence of a "sudden and accidental" discharge, nor does it support any inference thereof in the face of the undisputed evidence that a "sudden and accidental" discharge never occurred.

5.  E.g., Grain Dealers assumed the leakage of gasoline came from the depot (Doc. 38, p. 24).

### The Federated "Clarification"

Botkin Grain complains that the court erroneously entered summary judgment on the "clarification" of the pollution exclusion contained in the Federated policies. Botkin Grain's argument is that Federated did not seek summary judgment on the "clarification," so the court lacked authority to enter summary judgment.

It is true that Federated did not expressly request summary judgment on the "clarification." However, Botkin Grain raised the clarification in its memorandum in support of its motion for summary judgment and in opposition to the summary judgment motions filed by the insurance companies (Doc. 54, p. 36). Federated responded, submitting that Botkin Grain bore the burden to show that the "clarification" to the exclusion applied, i.e. that Botkin Grain had the burden to put forth evidence demonstrating that the contamination resulted from faulty pipes, tanks or connections to tanks (Doc. 58, pp. 39–41). Botkin Grain replied (Doc. 62, p. 4), arguing that the clarification did not apply because there is no evidence to suggest that Botkin Grain intended any discharge. Perhaps more to the point, Botkin Grain specifically prayed for summary judgment that Federated's pollution exclusion did *not* preclude coverage. Since the "clarification" was part and parcel of the pollution exclusion in Federated's policies for the period May 1983 through May 1986, the court was bound to consider it.

Botkin Grain does not take issue with the court's finding that the "clarification" is unambiguous. Rather, it now complains that "... there was nothing about Federated's factual assertions or its argument which required or would have caused Botkin Grain, in response, to list the various facts from which it can be inferred that leakage from the tanks or piping did occur." The court disagrees. In its response to Botkin Grain's reference to the clarification, Federated specifically noted that:

> Botkin has presented no evidence that demonstrates that the contamination resulted from faulty pipes, tanks or connections to tanks. Even if Federated has the burden of proof to demonstrate that leaks from tanks, piping or connections to tanks

caused the leaks, the record developed thus far demonstrates that no leaks occurred from connections to or from the pipes. First, Kyle Parker [the KDHE inspector] did not notice any leaks from the tanks or piping above ground pipes. Second, John Botkin did not see any holes in the underground piping that he dug and inspected. Third, the leaks that Lagrant Watts testified to that occurred when Mobil had the depot did not result from connections or piping connected to the tanks.

(Doc. 58, pp. 40–41). As the court indicated in its earlier order, Botkin Grain did not make a direct response to this argument.

In *Chrysler Credit Corporation v. Cathey,* 977 F.2d 447, 449 (8th Cir.1992) the court observed:

> ... the Rosses contend the district court erroneously granted summary judgment to the Haganses because they [Haganses] did not move for summary judgment or make allegations showing an absence of material fact. We disagree. Federal district courts have power to grant summary judgments sua sponte when the losing party is given sufficient advance notice and an adequate opportunity to submit evidence in opposition. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed 2d 265 (1986); *Interco Inc. v. National Sur. Corp.,* 900 F.2d 1264, 1269 (8th Cir.1990). Here, the Rosses knew the district court was considering Chrysler Credit's summary judgment motion and the Rosses had a chance to come forward with their evidence.

Thus, although Federated did not specifically move for summary judgment on the "clarification" issue, Botkin Grain has no room to now argue that it was not aware of Federated's position or that it was somehow blindsided by the court's ruling. The parties' cross-motions amount to hundreds of pages of memoranda and exhibits. The court had every reason to assume that this voluminous record contained whatever facts and authority were necessary to develop the parties' positions with respect to the cause of the contamination, leaks, etc., as well as coverage

issues.[6] The court saw no reason to leave unresolved the issue regarding the "clarification." Nevertheless, the court will revisit the "clarification" issue.

Under the court's ruling regarding the "sudden and accidental" language of the pollution exclusion, it is apparent that regardless when the contamination took place, the exclusion operates to exclude coverage under all Federated liability and umbrella policies (except those containing the "clarification") and the Grain Dealers' policy. The "clarification" was in effect in Federated's liability and umbrella policies effective from May 1983 to May 1986. The plain effect of the "clarification" is to make an unintentional discharge from tanks or underground piping "sudden and accidental," thereby effectively rendering the pollution exclusion inapplicable by its own terms.[7]

The Federated policies each provide:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage ... to which this insurance applies, caused by an occurrence ...

Property damages is defined as:

physical injury to or destruction of tangible property which occurs during the policy period ...

Occurrence is defined as:

An accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected or intended from the standpoint of the insured.

Based on these definitions, it is evident that there must have been an "occurrence" during the "clarification" period in order for Federated to be liable for coverage.

■ An "occurrence" policy provides coverage for acts which occurred while the policy is in effect.[8] *Civic Associates v. Security Ins. Co.,* 749 F.Supp. 1076, 1079 (1990). The insured bears the burden to prove that the loss was of the type covered, *Westchester Fire Ins. Co. v. City of Pittsburg, Ks,* 768 F.Supp. 1463, 1468 (D.Kan.1991) and that the loss occurred during the coverage period. *Hatco Corp. v. W.R. Grace & Co.,* 801 F.Supp. 1334, 1345 (D.N.J.1992). Thus, Botkin Grain bore the burden to show an "occurrence" between May 1983 and May 1986.

■ Botkin Grain argues that the court should apply the so-called "continuous trigger" theory to determine whether "occurrence" took place during the term of the policies. (Doc. 54, pp. 76, 80–85). Kansas has neither adopted nor rejected that theory. Botkin Grain notes that Judge Weinshenk adopted the theory in *Broderick Ins. Co. v. Hartford Acc. and Indem. Co.,* 742 F.Supp. 571, 573 (D.Colo.1989). On appeal, the Tenth Circuit reversed without comment on the "continuous trigger" theory. 954 F.2d 601 (1992).

Judge Weinshenk cited and apparently relied upon *Keene Corp. Ins. Co. of N. America,* 667 F.2d 1034 (D.C.Cir.1981). The *Keene* court found that the policy language "... clearly provides that an 'injury,' and not the 'occurrence' that causes the injury, must fall within a policy period for it to be covered under the policy." The injury involved in *Keene* was asbestos related and the court found that "... each insurer on the risk between the initial exposure [the occurrence] and the manifestation of disease [the injury] is liable ..." *id.* at 1040. The policy involved in *Broderick* clearly was an "occurrence" policy but Judge Weinshenk did not analyze the distinction between that policy and the policy in *Keene.* Judge Weinshenk also cited *Dayton Independent School Dist. v. National Gypsum,* 682 F.Supp. 1403 (E.D.Tex.1988), a property damage asbestos case which appar-

---

6. In its reply brief (Doc. 62, p. 16) Botkin Grain stated: "This court has everything it now needs before it to determine that these insurance companies have breached their duty to defend Botkin Grain...."

7. The exclusion provides, in pertinent part: "... but this exclusion does not apply if such discharge ... is sudden and accidental."

8. In contrast, a "claims made" policy provides coverage for claims which are discovered and brought to the attention of the insurance company during the term of the policy. *Id.*

ently applied the "continuous trigger" theory to "occurrence" coverage. *id.* at 1410.

It is not necessary for this court to try to predict whether Kansas courts would adopt the "continuous trigger" theory because there is a fundamental factual distinction between this case and cases such as *Broderick, Dayton* and *Hatco, supra.* In each of those cases, there was evidence of an "occurrence" during, or continuing during, the pertinent policy period or periods. In this case, such evidence is lacking.

▉ While keeping in mind that it is dealing with cross-motions for summary judgment and that each motion stands on its own, the court simply cannot find from consideration of either motion a trial issue regarding whether Botkin Grain can prove an "occurrence" between May 1983 and May 1986. Mr. Botkin believes fuel leaked during the time Mobil operated the depot (sometime between 1957 and 1978) and there is some evidence (inventory shortages) to support his belief. However, even if it is assumed that a leak or leaks occurred during that 11–year period, there is no evidence nor inference that contamination occurred at that time or, if so, that it continued into the applicable policy periods. Mr. Botkin has no records which would show fuel discrepancies prior to August 1986 and no other evidence to show discrepancies from which fuel losses (and hence contamination) could be inferred prior to August 1986. The holes in tank No. 5 and the discoloration in the sand under tank No. 5 were not discovered until after the depot was closed in 1989. There is no evidence when the holes first appeared in the tank and it would be rank speculation to infer that they existed between May 1983 and May 1986 and/or if they did, that sufficient fuel leaked from tank No. 5 to cause contamination. There is no evidence of leaks from piping or connections to tanks at any time. There is no evidence of the "age" of the fuel found in the neighbor's well. There is no evidence regarding when the neighbor's well was drilled.

▉ Because Botkin Grain moved for summary judgment that coverage under the Federated policies is not excluded (which is the same as moving for judgment that coverage

exists) (Doc. 54, p. 87), Botkin Grain carried the burden to show the existence of an "occurrence" which would trigger coverage during the "clarification" period. In the alternative, under the rule enunciated in *Chrysler Credit, supra,* Botkin Grain had the obligation to come forward with facts sufficient to create a trial issue with respect to whether an occurrence took place during the period when the "clarification" took place. Either way, Botkin Grain has failed to meet its burden and cannot rely on the "clarification" to defeat summary judgment.

### Duty to Defend

Botkin Grain correctly states that in its earlier order the court did not rule directly whether the insurance companies have a duty to defend Botkin Grain against the KDHE demand for remediation. The court will do so now.

By letter dated November 29, 1990, Botkin Grain's attorney wrote to Grain Dealers. The letter states counsel's understanding that an adjuster had "looked into" the contamination problem and in October 1989, orally advised Botkin Grain that there was "no coverage" (Exhibit HH). No specific demand for defense was made. Grain Dealers responded by letter dated December 14, 1990 (Exhibit II). It stated, in pertinent part: "We did therefore notify the insured and do hereby advise you . . . that there is no coverage afforded for the leakage which has been going on for several years. . . . Grain Dealers does not waive any rights which it may have to deny this claim or defendant against it."

By letter dated December 27, 1990 to Federated's counsel, Grain Dealers' attorney confirmed an earlier conversation and made demand for defense and indemnification (Exhibit I). Federated's counsel responded by letter dated April 15, 1991 (Exhibit J). The letter denied coverage on several grounds, some of which are not raised in Federated's motion for summary judgment. Coverage was denied, in part, because there was no "occurrence," because there was no evidence of a "sudden and accidental" discharge and because environmental clean-up costs are not

"damages" (citing *United States Fidelity and Guaranty Co. v. Morrison Grain Co.,* 734 F.Supp. 437 (D.Kan.1990)).

Federated filed its Complaint for Declaratory Judgment on June 10, 1991 (Doc. 1). Botkin Grain filed its answer on July 16, 1991 and counterclaimed for a declaration of a duty to defend (Doc. 8). Grain Dealers filed its Complaint for Declaratory Judgment on January 15, 1992 (Doc. 21). Botkin Grain answered and counterclaimed for a defense on January 28, 1992 (Doc. 23).

In its earlier memoranda (Doc. 54, p. 85 and Doc. 62, p. 15), as well as in its present motions, Botkin Grain relies on *American Motorists Ins. Co. v. General Host Corp.,* 946 F.2d 1489 (10th Cir.1991), to support its argument that it is entitled to a defense. *American Motorists* arose out of this court and the ruling appealed from is reported at 667 F.Supp. 1423 (1987). Judge Theis granted summary judgment in favor of American Motorists, finding that the pollution exclusion of the American Motorists' policy (identical to the exclusion in this case) applied, thereby relieving American Motorists of its obligation to defend and indemnify its insured in two cases: *Miller v. Cudahy Co.,* in which judgment had been entered, and *Brothers v. American Salt,* which was pending. Judge Theis observed that the *Brothers* case took over where the *Miller* case left off, but otherwise involved the same set of facts.

The panel's decision affirming Judge Theis is reported as *American Motorists Ins. Co. v. General Host Corp.,* 946 F.2d 1482 (1991). The panel then granted General Host's motion for rehearing and changed its decision. 946 F.2d 1489 (1991). For convenience, the panel's decisions will be referred to as *American Motorists I and II.*

■ *American Motorists I* reaffirmed the well-recognized precept that the duty to defend is broader than the duty to indemnify and that an insurer may have a duty to defend even though it ultimately may be found not to have an obligation to indemnify any liability which may be found against the insured. So long as the insured can show a "non-frivolous possibility" (elsewhere described as a "credible possibility") that the claim may be covered, a duty to defend exists. The insurance company must, at the time the demand for defense is made, look beyond the complaint and consider any facts which the insurance company could reasonably discover in determining whether it has a duty to defend. *id.* at 1490–91. The panel found on the basis of issue preclusion that because Judge Theis had correctly determined in *Miller* that American Motorists was not required to defend or indemnify its insured, then it was not necessary for American Motorists to relitigate essentially identical issues in order to determine whether American Motorists was obligated to defend and indemnify its insured in the *Brothers* case. The panel concluded that American Motorists had no duty to defend in either *Miller* or *Brothers* because the damage (salt pollution) was not sudden and accidental and was "plainly outside the scope of coverage of the policies." In light of its conclusion that there was no duty to defend, the court also concluded that American Motorists had no duty to indemnify any settlement in *Brothers.*

In *American Motorists II,* the defendants in the *Miller* case argued on rehearing that in deciding that American Motorists had no duty to defend the *Miller* case, the court of appeals erroneously relied on the findings made in the appeal from its decision in the underlying pollution case, reported at 858 F.2d 1449, 1458 (1988) cert. denied 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610.[9] The *Miller* defendants argued that American Motorists' duty of defense depended on the allegations and other information available to it at the time the demand for defense was made, rather than upon the facts found after the case was tried. Despite the fact that the demand to defend had been made on the eve of trial, the panel agreed with the *Miller* defendants. It did not find, however, that American Motorists had a duty to defend. Instead, it remanded the case to Judge Theis to determine the duty to defend issue based on the facts at the time the demand was made. At this time, Judge Theis has that issue under advisement.

---

**9.** The district court's opinion is reported at 656 F.Supp. 316.

In its earlier memorandum (Doc. 54, pp. 85–87), Botkin Grain's position was that "It was frivolous for these insurance companies to deny a defense to Botkin Grain by relying on the pollution exclusion when they have no evidence to satisfy their burden of proof [i.e. that any discharge was not "sudden and accidental"]. This court should find now as a matter of law that there is undeniably a "non-frivolous" possibility that the claims of the state of Kansas may fall within the insuring agreements of the policies issued to Botkin Grain."

Botkin Grain's present position is the same (Doc. 82, pp. 9–11). As before, it does not spend any time discussing its demands for a defense or what was known to, or discoverable by, the insurance companies when the demands were made. Rather, it simply relies upon American Motorists II and avers that it has suffered "a great deal of damages" responding to the state's claim for investigation and clean-up. In short, Botkin Grain seems to assume that it is entitled to summary judgment on the duty to defend issue or, if not, at least a trial.

A threshold factual issue is when demands for defense were made. In Federated's case, the demand was made in counsel's letter of December 27, 1990. In Grain Dealers' case, it does not appear that a written demand was ever made. While Botkin Grain contends that Grain Dealers admits a demand was made on September 18, 1989, the fact upon which Botkin Grain relies (Doc. 38, Fact 37) says only that Grain Dealers hired an investigator on that day. Since no evidence of a pre-suit demand appears, the court finds that Botkin Grains' demand for a defense came when it filed its counterclaim on January 28, 1992 (Doc. 23).

The next question which the court must answer is: does a jury question exist regarding whether there was non-frivolous or credible possibility that Botkin Grain's claim might be covered when Botkin Grain made its demand for a defense from Federated in December 1990? The undisputed material facts which appear to have been known (and discoverable) to Federated are that Botkin Grain was responding to a claim by the KDHE, and perhaps others, that a discharge from its fuel depot had polluted nearby groundwater and that the groundwater, in fact, was polluted with gasoline. There was evidence that a tank had leaked, but the date (or dates), duration and quantity of the leak were unknown, and there is nothing to indicate that they were discoverable. The then-operator of the insured depot, Mr. Botkin, did not believe the leak had occurred while he operated the depot and instead placed the responsibility on his predecessor, Mobil Oil. No third party had expressed any opinion regarding the specific source or time of the pollution. There was no evidence that a discharge, if it had occurred, had been "sudden and accidental." Judge Crow had ruled in a factually and legally similar case that coverage was excluded unless the discharge was "sudden and accidental." He also had opined, in *dicta*, that losses such as those allegedly suffered by Botkin Grain were not "damages" within the scope of policy coverage. In summary, there was no evidence, nor was any evidence discoverable, of an "occurrence" or of a "sudden and accidental" discharge during the period when Federated was on the risk.

Under these circumstances, the court finds no jury issue regarding whether there was a credible possibility that Federated's policies covered Botkin Grain's claim. The court finds as a matter of law that Federated had no duty to defend Botkin Grain.

The same conclusion follows with respect to Grain Dealers, except more forcefully so. At the time Botkin Grain made its demand for a defense in January 1992, the undisputed facts demonstrate that there was no evidence, known or discoverable, of an "occurrence" which would have triggered coverage or of a "sudden and accidental" discharge which would have nullified the pollution exclusion in Grain Dealers' policies. There was no credible possibility that Grain Dealers' policies covered Botkin Grain's claim and therefore the court likewise finds as a matter of law that Grain Dealers had no duty to defend Botkin Grain. *Patrons Mutual Insurance Assn. v. Harmon*, 240 Kan. 707, 710, 732 P.2d 741 (1987).

In view of these rulings, it is not necessary for the court to decide whether Botkin Grain has sustained "damages" with the definitions of the various policies.

*Botkin Grain's Motion to Supplement*

██ Botkin Grain's motion (Doc. 89) is denied, essentially for the reasons set forth in Federated's response. To the extent, if any, the briefs cited by Botkin Grain have any bearing on the issues in this case, they are not "newly discovered" nor do they constitute fraud, misrepresentation or misconduct on the part of Federated.

*Final Orders*

Botkin Grain's motion to alter or amend (Doc. 80) is granted only to the extent of the duty to defend issue and on that issue, summary judgment is entered for the insurance companies. In all other respects, the motion is denied. Botkin Grain's motion to supplement (Doc. 89) is denied. The court's order of consolidation for purposes of discovery (Doc. 72) is vacated.

No further post-judgment motions may be filed by any of the parties.

IT IS SO ORDERED.